No. 22-10967

# In the United States Court of Appeals for the Eleventh Circuit

MARYBETH LUKIE,
*Plaintiff-Appellant,*

v.

METLIFE GROUP, INC.,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the Middle District of Florida, Tampa Division
Case No. 8:20-cv-943, Hon. Thomas P. Barber

## APPELLANT'S BRIEF OF MARYBETH LUKIE

Kathryn C. Hopkinson
CURRAN ANTONELLI LLP
400 North Tampa Street, 15th floor
Tampa, FL 33602
(508) 274-9169
khopkinson@curranantonelli.com

*Trial counsel for MaryBeth Lukie*

Thomas A. Burns
Shannon C. Reese
BURNS, P.A.
301 West Platt Street, Suite 137
Tampa, FL 33606
(813) 642-6350
tburns@burnslawpa.com
sreese@burnslawpa.com

*Appellate counsel for MaryBeth Lukie*

*Lukie v. MetLife Group Inc.*, No. 22-10967

# <u>CERTIFICATE OF INTERESTED PERSONS</u>

Pursuant to Eleventh Circuit Rules 26.1-1 and 26.1-3, the following is an alphabetical list of the trial judges, attorneys, persons, and firms with any known interest in the outcome of this case.

1.  Barber, Hon. Thomas P. – United States District Judge;

2.  Burns, Thomas A. (of Burns, P.A.) – Appellate counsel for Plaintiff-Appellant;

3.  Field, Carol Ann (of Morgan, Lewis & Bockius, LLP) – Trial counsel for Defendant-Appellee;

4.  Hale, Ashley J. (of Morgan, Lewis & Bockius, LLP) – Trial counsel for Defendant-Appellee;

5.  Holden, West Allen (of Littler Mendelson, P.C.) – Former trial counsel for Defendant-Appellee;

6.  Hopkinson, Kathryn Comly (of Curran Antonelli LLP) – Trial counsel for Plaintiff-Appellant;

7.  Lukie, MaryBeth – Plaintiff-Appellant;

8.  Magrisso, Joseph (of Morgan, Lewis & Bockius, LLP) – Appellate counsel for Defendant-Appellee;

9.  McCrea, Rich (of Greenberg Traurig, P.A.) – Former trial counsel for Defendant-Appellee;

10. MetLife Group, Inc. – Defendant-Appellee;

11. MetLife, Inc. (NYSE: MET) – Parent corporation of Defendant-Appellee;

12. Parlo, Christopher A. (of Morgan, Lewis & Bockius, LLP) – Trial counsel for Defendant-Appellee;

*Lukie v. MetLife Group Inc.*, No. 22-10967

13. Reese, Shannon C. (of Burns, P.A. in Tampa, Florida) – Appellate counsel for Plaintiff-Appellant;

14. Sansone, Hon. Amanda Arnold – United States Magistrate Judge;

15. Thompson, James Moten (of Thompson Legal Center, LLC) – Trial counsel for Plaintiff-Appellant.

MetLife Group, Inc., is a corporation organized under the laws of New York and with its principal place of business in New York. It's a wholly owned subsidiary of MetLife, Inc. (NYSE: MET).

August 25, 2022                          /s/ Thomas Burns
                                         Thomas A. Burns

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Plaintiff-Appellant, MaryBeth Lukie, requests oral argument.

In addition to fulfilling her significant and extensive professional duties as the only female vice president in MetLife's Enterprise Risk Management group, Lukie's superiors expected her to perform traditionally feminized administrative and secretarial duties for her male bosses, male superiors to whom she did not report, and other male colleagues. And she was expected to perform those additional demeaning tasks while being paid less than the other male vice presidents. When she complained about the sexist division of labor to a new boss, he constructively discharged her by stripping key professional duties from her and giving them to a male with no prior experience in that area. A year later, that male went on to become a senior vice president.

The district court rejected Lukie's employment discrimination and retaliation claims at summary judgment despite numerous genuine disputes of material fact. This appeal is fact-intensive, and the record is somewhat extensive. Oral argument will assist the Court.

## TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ..................................... C-1

STATEMENT REGARDING ORAL ARGUMENT .................................... i

TABLE OF CITATIONS ........................................................... vi

TABLE OF ACRONYMS ........................................................... xi

TABLE OF METLIFE COLLEAGUES .......................................... xi

STATEMENT OF JURISDICTION ........................................ xiii

STATEMENT OF THE ISSUES ................................................ 1

STATEMENT OF THE CASE ................................................. 1

*Nature of the case* .......................................................... 1

*Course of proceedings* ..................................................... 3

*Statement of facts* .......................................................... 4

    A.   Lukie begins working for MetLife and is bombarded with sexist comments, such as "is that a banana in my pants or am I just happy to see you?" ................................... 5

    B.   Lukie transfers to the Enterprise Risk Management group as a VP and receives stellar evaluations ..................... 6

    C.   Lukie protests that she is required to perform feminized secretarial and administrative duties for male superiors and male colleagues ............................................... 7

    D.   Lukie continues to receive stellar evaluations ..................... 10

    E.   Lukie's bosses assure her that they'll remedy the sexist division of labor, but repeatedly break their promises ........ 11

F.  Lukie asks to transfer from New Jersey to Tampa, Cox approves the move, Lukie begins reporting to him, and the discriminatory practices become worse ..........................12

G.  Lukie again protests the sexist division of labor and tries to resign, but is again promised it'll improve.......................14

H.  Cox strips Lukie's MIM duties, transfers them to a male with no MIM experience who had left MetLife, and gives Lukie an administrative assignment instead, thereby constructively discharging her ...............................................17

I.  MetLife constantly pays Lukie less than her male VP peers ....................................................................................24

    1.  Lukie is paid less than Orr, Semke, and Kurpit .........24

    2.  Each male VP reports to the same executive, manages the same average number of employees, and has similar responsibilities, but less tenure ...............26

    3.  MetLife has an actuarial pay scale, an investments pay scale, and a corporate pay scale .................26

    4.  Actuarial training in insurance mathematics wasn't important to run MIM risk ...............................27

J.  The district court grants summary judgment against Lukie's sex discrimination, sexual harassment, and retaliation claims ....................................................................27

    1.  Count one's sex discrimination pay claims are rejected because Lukie's male comparators supposedly weren't similarly situated in all material respects.............................................................................28

    2.  Count one's sex discrimination assignments claims are rejected because they supposedly weren't adverse employment actions ............................29

iii

3.    Count three's retaliation claims are rejected be-
cause there supposedly was no causation, pretext,
or constructive discharge ..............................................29

*Standard of review* .......................................................................30

SUMMARY OF THE ARGUMENT ........................................................30

ARGUMENT AND CITATIONS OF AUTHORITY ................................31

I.    MetLife sexually discriminated against Lukie by paying her
less than male colleagues and requiring her to perform tradi-
tionally feminized secretarial and administrative tasks (count
one) ....................................................................................................31

A.    Sex discrimination claims under the Florida Civil Rights
Act are assessed under *McDonnell Douglas*'s burden-
shifting framework ................................................................31

B.    MetLife discriminated against Lukie when they paid
her less than the male VPs, who were similar to her in
all material respects ..............................................................34

C.    MetLife also sexually discriminated against Lukie when
it required her to perform feminized secretarial and ad-
ministrative tasks, unlike her male colleagues ...................42

1.    The additional feminized duties were sex discrim-
ination .........................................................................43

2.    The additional feminized duties were adverse em-
ployment actions.........................................................44

a.    Many employment actions qualify as adverse
...........................................................................44

b.    MetLife's assignment of feminized duties
qualified as adverse employment actions ...........46

iv

D.    At minimum, Lukie established a "convincing mosaic" of discrimination .......................................................................49

II.    MetLife retaliated against Lukie for complaining about the sexist division of labor when Cox constructively discharged her by stripping her MIM duties and giving them to an inexperienced male (count three) ...........................................................52

A.    To prove retaliation, a plaintiff must show a causal link between her statutorily protected expression and an adverse employment action .......................................................53

1.    Cox was aware of Lukie's complaints when he stripped her MIM duties ...............................................54

2.    Lukie's complaints weren't wholly unrelated to Cox's removal of her MIM duties.................................56

B.    A reasonable jury could find MetLife's proffered reasons for removing her MIM duties were mere pretext .................58

C.    A reasonable jury could find Lukie was constructively discharged ...................................................................63

D.    At minimum, Lukie established a convincing mosaic of retaliation...................................................................64

CONCLUSION ......................................................................64

CERTIFICATE OF COMPLIANCE ............................................66

CERTIFICATE OF SERVICE ...................................................67

# TABLE OF CITATIONS

**Cases**                                                                    **Page(s)**

*Alvarez v. Royal Atl. Devs., Inc.,*
    610 F.3d 1253 (11th Cir. 2010) ................................................32, 33, 34

*Beltrami v. Special Counsel, Inc.,*
    170 Fed. App'x 61 (11th Cir. 2006) ......................................................53

*Bonner v. City of Prichard,*
    661 F.2d 1206 (11th Cir. 1981) (en banc) ...........................................44

*Bowen v. Manheim Remarketing, Inc.,*
    882 F.3d 1358 (11th Cir. 2018). ........................................34, 39, 41, 42

*Burlington N. & Santa Fe Ry. Co. v. White,*
    548 U.S. 53 (2006) ...............................................................................53

*Calicchio v. Oasis Outsourcing Group Holdings, LP,*
    2022 WL 2761720 (11th Cir. July 15, 2022) .......................................35

*Chapman v. AI Transp.,*
    229 F.3d 1012 (11th Cir. 2000) ...........................................................33

*Chapter 7 Trustee v. Gate Gourmet, Inc.,*
    683 F.3d 1249 (11th Cir. 2012) ...........................................................51

*Cox v. Am. Cast Iron Pipe Co.,*
    784 F.2d 1546 (11th Cir. 1986) .....................................................42, 43

*Crawford v. Carroll,*
    529 F.3d 961 (11th Cir. 2008) .............................................................30

*Davis v. Town of Lake Park, Fla.,*
    245 F.3d 1232 (11th Cir. 2001) .....................................................45, 48

*Donnellon v. Fruehauf Corp.,*
    794 F.2d 598 (11th Cir. 1986) .............................................................56

*Edwards v. Shanley,*
  666 F.3d 1289 (11th Cir. 2012) ..........................................................38

*Fitzpatrick v. City of Atlanta,*
  2 F.3d 1112 (11th Cir. 1993) ..............................................................33

*Furnco Constr. Corp. v. Waters,*
  438 U.S. 567 (1978) ...........................................................................50

*Giles v. Ireland,*
  742 F.2d 1366 (11th Cir. 1984) ..........................................................48

*Gillis v. Ga. Dep't of Corr.,*
  400 F.3d 883 (11th Cir. 2005) ............................................................45

*Hairston v. Gainesville Sun Pub. Co.,*
  9 F.3d 913 (11th Cir.1993) .................................................................41

*Hall v. Ala. State Univ.,*
  2022 WL 2195021 (M.D. Ala. June 17, 2022)....................................37

*Hamilton v. Southland Christian School, Inc..,*
  680 F.3d 1316 (11th Cir. 2012) ..........................................................51

*Harper v. Blockbuster Entm't Corp.,*
  139 F.3d 1385 (11th Cir. 1998) ..........................................................32

*Hertz Corp. v. Friend,*
  559 U.S. 77 (2010) ............................................................................ xiii

*Hinson v. Clinch County, Ga. Bd. of Educ.,*
  231 F.3d 821 (11th Cir. 2000) ......................................................44, 45

*Hughes v. Wal-Mart Stores E., LP,*
  846 Fed. App'x 854 (11th Cir. 2021) ..................................................57

*Jameson v. Arrow Co.,*
  75 F.3d 1528 (11th Cir. 1996),
  *abrogated on other grounds by O'Connor v. Consol. Coin*
  *Caterers Corp.,* 517 U.S. 308 (1996) ..................................................34

*Jefferson v. Sewon Am., Inc.*,
  891 F.3d 911 (11th Cir. 2018) .......................................................45, 60

*Joshua v. City of Gainesville*,
  768 So. 2d 432 (Fla. 2000) ....................................................................32

*Lewis v. City of Union City*,
  918 F.3d 1213 (11th Cir. 2019) (en banc) ................................34, 35, 36

*Lewis v. City of Union City*,
  934 F.3d 1169 (11th Cir. 2019) ................................................50, 51, 52

*Matamoros v. Broward Sheriff's Off.*,
  2 F.4th 1329 (11th Cir. 2021) ...............................................................53

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973) ...............................................................32, 33, 50

*\*Miranda v. B&B Cash Grocery Store, Inc.*,
  975 F.2d 1518 (11th Cir. 1992) .........................................32, 34, 38, 41

*\*Mulhall v. Advance Sec., Inc.*,
  19 F.3d 586 (11th Cir. 1994) .............................................35, 37, 39, 41

*\*Patterson v. Ga. Pac., LLC*,
  38 F.4th 1336 (11th Cir. 2022)...................................38, 54, 56, 59, 62

*Jones v. Gulf Coast Health Care of Delaware, LLC*,
  854 F.3d 1261 (11th Cir. 2017) ...........................................................54

*\*Poole v. Country Club of Columbus, Inc.*,
  129 F.3d 551 (11th Cir. 1997) ..............................................................63

*Reddy v. Dep't of Educ., Ala.*,
  808 Fed. App'x 803 (11th Cir. 2020) .....................................................41

*Rioux v. City of Atlanta, Ga.*,
  520 F.3d 1269 (11th Cir. 2008) ...........................................................59

*Sims v. MVM, Inc.*,
  704 F.3d 1327 (11th Cir. 2013) ...........................................................50

*Smith v. City of Fort Pierce, Fla.*,
  565 Fed. App'x 774 (11th Cir. 2014) ...................................................53

\*Smith v. Fletcher,
  559 F.2d 1014 (5th Cir. 1977) .................................................43, 47, 49

\*Smith v. Lockheed-Martin Corp.,
  644 F.3d 1321 (11th Cir. 2011) .....................................................50, 51

*Speedway SuperAmerica, LLC v. Dupont*,
  933 So. 2d 75 (Fla. 5th DCA 2006) ....................................................32

*Stewart v. DaimlerChrysler Fin. Servs. Americas LLC*,
  2008 WL 11333128 (S.D. Fla. Dec. 19, 2008) ...................................57

*Tamimi v. Howard Johnson Co.*,
  807 F.2d 1550 (11th Cir. 1987) ..........................................................44

*Taylor v. Appleton*,
  30 F.3d 1365 (11th Cir. 1994) ........................................................ xiii

*Tebo v. City of DeBary, Fla.*,
  784 Fed. App'x 727 (11th Cir. 2019) ..................................................56

*Tex. Dep't of Cmty. Affairs v. Burdine*,
  450 U.S. 248 (1981) ....................................................................33, 34

*USPS Bd. of Gov. v. Aikens*,
  460 U.S. 711 (1983) ..............................................................33, 41, 50

*Walker v. City of Hapeville*,
  2009 WL 10665771 (N.D. Ga. June 17, 2009) ...................................42

*Washington County v. Gunther*,
  452 U.S. 161 (1981) ....................................................................32, 38

*Wideman v. Wal-Mart Stores, Inc.*,
    141 F.3d 1453 (11th Cir.1998) ............................................................45

*Woodham v. BCBS of Fla., Inc.*,
    829 So. 2d 891 (Fla. 2002)............................................................31, 32

## **Statutes**                                                          **Page(s)**

28 U.S.C. § 1291 ...................................................................... xiii

28 U.S.C. § 1332 ...................................................................... xiii

Fla. Stat. § 760.01 ....................................................................31

Fla. Stat. § 760.10 ..............................................................32, 53

## **Other authorities**                                                 **Page(s)**

*Cougar*, Dictionary.com,
    *at* https://www.dictionary.com/browse/cougar
    (visited Aug. 25, 2022)..............................................................2

MetLife,
    *About Us*,
    *at* https://www.metlife.com/about-us/corporate-profile/global-loca-
    tions (visited Aug. 25, 2022)..................................................4

SCHLEI, BARBARA & PAUL GROSSMAN,
    EMPLOYMENT DISCRIMINATION LAW
    (2d ed. 5-Year Cum. Supp. 1989).........................................33

## TABLE OF ACRONYMS

- **AVP:** Assistant Vice President;

- **CPA:** Certified Public Accountant;

- **EEOC:** Equal Employment Opportunity Commission;

- **ERM:** Enterprise Risk Management;

- **EVP:** Executive Vice President;

- **FCHR:** Florida Commission on Human Relations;

- **FCRA:** Florida Civil Rights Act;

- **MBA:** Master of Business Administration;

- **MIM:** MetLife Investment Management;

- **SVP:** Senior Vice President;

- **VP:** Vice President.

## TABLE OF METLIFE COLLEAGUES

- **Cassandra, Frank:** SVP who supervised Lukie;

- **Chatterji, Injarjit ("I.C."):** An employee who reported to SVP Cox;

- **Cox, Graham:** SVP who supervised Lukie;

- **DeKeizer, Dan:** Senior executive to whom Lukie did not report;

- **Erhardt, Carl:** General auditor while Lukie worked in internal audit;

- **Evangel, Lori:** SVP who supervised Lukie;

- **Kiffel, Ed:** Coworker of Lukie's while in internal audit;

- **Kurpit, Howard:** A fellow VP under SVP Evangel;

- **Liu, Ray:** Reported to Lukie until her MIM duties were removed;

- **Maxwell, Jai:** Employee who Lukie began supervising after MIM was taken from her;

- **Mendez, Carlos:** Lukie's supervisor while in internal audit;

- **Orr, Scott:** A fellow VP under SVPs Evangel, Cassandra and Cox;

- **Semke, Robert:** A fellow VP under SVP Evangel;

- **Talbi, Stan:** Senior executive above Cox and below the CEO.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1) (diversity).[1] This Court has appellate jurisdiction under 28 U.S.C. §1291 because the district court granted summary judgment on all counts to MetLife (Doc. 40) and entered judgment on February 25, 2022 (Doc. 41). Lukie timely appealed on March 25, 2022. Doc. 43.

---

[1] On April 18, 2022, this Court issued a jurisdictional question directing the parties to explain whether it had diversity jurisdiction. It noted the complaint had alleged Lukie was merely a resident, but not necessarily a citizen, of Hillsborough County, Florida. *See Taylor v. Appleton*, 30 F.3d 1365, 1367 (11th Cir. 1994) ("Citizenship, not residence, is the key fact that must be alleged in the complaint to establish diversity for a natural person."). On May 2, 2022, the parties jointly responded, and Lukie separately filed an unopposed motion to amend the complaint to correct the deficient citizenship allegation. *See* 28 U.S.C. § 1653 (authorizing amendment of defective allegations while appeal is pending). On June 30, 2022, this Court granted the request.

As amended at paragraph 2, the complaint now alleges Lukie is a resident of and domiciled in Hillsborough County, Florida, and that she's therefore a citizen of Florida. Doc. 1.1 at 1. The complaint further alleges that MetLife is a foreign corporation doing business in Florida. *Id.* Specifically, MetLife is a corporation organized under the laws of and with its principal place of business in New York. Doc. 1 at 2; *see also* 28 U.S.C. § 1332(c)(1) (corporations are citizens where incorporated and where they have their "principal place of business"); *Hertz Corp. v. Friend*, 559 U.S. 77, 80-81 (2010) ("the phrase 'principal place of business' refers to the place where the corporation's high level officers direct, control, and coordinate the corporation's activities," which "will typically be found at a corporation's headquarters").

## STATEMENT OF THE ISSUES

1.     Were there genuine disputes of material fact whether MetLife discriminated against Lukie because of her sex when they paid her less than the male vice presidents and expected her to perform both her professional duties plus feminized secretarial and administrative duties, unlike her male peers?

2.     Were there genuine disputes of material fact whether MetLife retaliated against Lukie for complaining about the discrimination when it constructively discharged her by stripping her of key professional duties and giving them to a male with no such experience?

## STATEMENT OF THE CASE

### *Nature of the case*

Throughout Lukie's employment with MetLife, she was subjected to harassment, discrimination, and retaliation. Doc. 32 at 2-8. As an assistant vice president ("AVP"), her internal audit colleagues bombarded and belittled her with sexist comments about a woman's "place" in the kitchen, to go "bake a cake" or "sort [her] fruit," to tell the women in investments to "keep their legs crossed" so they wouldn't get pregnant, and

that she was "a cougar."[2] Once, she was even asked "is that a banana in my pants or am I just happy to see you?"[3] Doc. 32.14 at ¶ 6.

Despite this sexual harassment, Lukie excelled, was promoted to vice president ("VP"), and transferred to MetLife's Enterprise Risk Management ("ERM") group. Docs. 32 at 2-3; 32.14. Alas, she hadn't escaped the sexism. Now, she endured two new kinds of discrimination: a sexist division of labor and disparate pay.

First, she was expected not only to perform her professional VP duties, but also to perform feminized secretarial and administrative tasks for her male bosses, male superiors to whom she didn't report, and other male colleagues. *Id.* at 5-7. In contrast, the male VPs weren't expected to do the same. *Id.*

Second, MetLife paid Lukie less than other male VPs. *Id.* at 6. And that was so even though, in addition to her professional responsibilities, she was expected to work longer and harder in order to keep performing these feminized secretarial and administrative duties. *Id.* at 5-7. For

---

[2] A "cougar," in this context, is slang for "an older woman who seeks sexual relationships with much younger men." *Cougar*, Dictionary.com, *at* https://www.dictionary.com/browse/cougar (visited Aug. 25, 2022).

[3] A "banana," in this context, is slang to suggest the presence of an erect penis.

instance, perpetuating sexist myths, she was told to "be the scribe" and that men were more "technical" in nature. Doc. 32.8 at 104:17-105:4, 114:16-23.

She repeatedly complained about the sexist division of labor and was continuously assured things would change, but they didn't. Docs. 32 at 6-7; 32.8 at 48:21-49:6, 305:6-308:2. Ultimately, not long after Lukie's complaints, the senior vice president ("SVP") to whom she reported stripped one of her main professional areas from her and gave it to a male with no experience in that area. Doc. 32 at 8. He replaced her professional duty with yet another administrative one, babysitting a male with no professional credentials. Doc. 32 at 8. In response, Lukie then submitted her resignation. *Id.* The male to whom her professional duties had been reassigned was promoted to SVP one year later. Doc. 32.11 at 7:13-17. Litigation ensued.

### *Course of proceedings*

On March 5, 2018, Lukie filed a charge with both the U.S. Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations ("FCHR"). Doc. 40 at 2; Doc. 1 at ¶ 31. It charged MetLife with sex-based discrimination, sexual harassment, and

retaliation, noting it was "very clear" that MetLife "had and continues to have a 'good old boys' culture." Docs. 1 at ¶ 31; 32.13. "[U]nable to conclude that the information obtained establishes violations of the statute," the EEOC eventually issued a notice of right to sue. *See id.* at 4.

Lukie filed a three-count complaint against MetLife in Florida state court asserting violations of the Florida Civil Rights Act ("FCRA"). Doc. 1.1. Count one asserted sex discrimination. Doc. 1.1 at 3-5. Count two asserted sexual harassment. *Id.* at 5-8. And count three asserted retaliation. *Id.* at 8-10. MetLife removed to the Middle District of Florida on diversity grounds. Doc. 1.

After discovery, MetLife moved for summary judgment. Doc. 31. Lukie opposed. Doc. 32. MetLife replied. Doc. 34. The district court granted it on all counts. Doc. 40. This appeal followed. Doc. 43.

### *Statement of facts*

"Established in 1868, MetLife is the largest life insurer in the United States based on life insurance in force." MetLife, *About Us*, *at* https://www.metlife.com/about-us/corporate-profile/global-locations (visited Aug. 25, 2022). It offers life insurance, annuities, auto and home insurance, and other financial services to individuals as well as "group

insurance and retirement and savings products and services to corporations and other institutions." *Id.*

### A. Lukie begins working for MetLife and is bombarded with sexist comments, such as "is that a banana in my pants or am I just happy to see you?"

Lukie was a CPA with an MBA. Doc. 32.14 at ¶ 2. She began working for MetLife in December 2007 as an AVP in its internal audit department. Docs. 32.14 at ¶¶ 1, 4; 32.8 at 188.

While in internal audit, Lukie was bombarded with sexist comments. For instance, her supervisor, Carlos Mendez, "would tell me to go sort my fruit because I am a woman" and "because I'm a woman, that it would resonate with me to go bake a cake" in front of other professionals such as Deloitte colleagues. Doc. 32.8 at 191:19-192:4, 199:16-20. "It was constant." *Id.* at 192:7-9. "He would talk to me as if I had no clue." *Id.*

When Lukie had some employees going out on maternity leave, Carl Erhardt, the general auditor, told her, "I should tell my women in my group to keep their legs crossed so that they don't get pregnant." *Id.* at 190:13-22. He called Lukie a "cougar." *Id.* at 289:2-19, 187:12-23.

Once, Ed Kiffel crudely asked Lukie, "is that a banana in my pants or am I just happy to see you?" Doc. 32.14 at ¶ 6.

### B.    Lukie transfers to the Enterprise Risk Management group as a VP and receives stellar evaluations

In 2011, Lukie transferred to the ERM Group as a VP of regulatory model risk, MetLife investment management ("MIM") risk, and operational risk. Doc. 32.14 at ¶ 7. Despite transferring, she still had ongoing interaction with the internal audit department, including Erhardt, and was singled out by them to be audited while others weren't. Doc. 32.8 at 187:15-23, 188:4-189:4.

Lukie and four other male VPs (Rob Semke, Scott Orr, Howie Kurpit, and Jim Dingler) reported to SVP Lori Evangel. Docs. 32.14 at ¶ 7; 32.2. Each VP had different areas of expertise. Doc. 32.8 at 154:23-155:5. In November 2012, Frank Cassandra replaced Evangel as SVP. Doc. 32.14 at ¶ 8.

In December 2012, Cassandra's evaluation wrote that Lukie had been "absolutely critical" in helping transition into his new role. Doc. 31.5 at 5. He said she was "extremely knowledgeable, always professional, very organized, [and] focused." *Id.* And he lauded her "exemplary work ethic," dedication, ability to "communicate effectively," and attentiveness to her own work and her staff's work. *Id.* In particular, he praised her work as a project coordinator who helped him "'herd the cats'" on a

project, which "exceeded [his] expectations." *Id.* In sum, he said she was "a pleasure to work with," "clearly [his] 'go to' person in the unit," and someone who "stands out as a leading contributor." *Id.*

Continuing that theme, in December 2013, Cassandra wrote in Lukie's next annual evaluation that she had "contributed tremendously to the organization's progress" by, *inter alia,* "leveraging her formidable organizational skills in keeping the team on track," remaining relentlessly "proactiv[e]," and demonstrating "key leadership qualit[ies]." *Id.* at 8. During her tenure, Lukie attended external leadership training sessions, including one by Harvard University. Doc. 32.14 at ¶ 10.

## C.   Lukie protests about being required to perform feminized secretarial and administrative duties for male superiors and male colleagues

But Lukie was "only woman in the direct report chain" at the VP level or above who reported to Cassandra; he treated her like a secretary and required she do administrative work. Doc. 32.8 at 51:4-8, 52:13-18.

For instance, for his weekly staff meetings, she typed the agenda. *Id.* at 104:7-20. For town hall meetings, she assembled the slides. *Id.* at 106:7-24. She would collect content from the direct reports and then do "colors and fonts to make them consistent so that a presentation would

not be ten point in Times Roman from somebody else versus 12 point in Calibri." *Id.* at 111:15-23. She would take individual slides from "Graham, Dan DeKeizer, Antonio Gonzales and Howie Kurpit" and "merge them all together and fix colors and fonts." *Id.* at 112:4-23. She put together PowerPoint presentations and direct reports for Cassandra and was often asked to do work for men, and "that was their direct responsibility, but I would be asked to do it, to write their policies, to develop their board materials, do presentations and slides for them." Doc. 32.8 at 40:22-41:11, 43:17-24. She complained these tasks were secretarial or administrative in nature and "not what I was hired to do." *Id.* at 116:12-23.

Cassandra had her develop his yearly goals and objectives and take minutes at meetings he attended. Doc. 32.8 at 42:4-17, 126:1-25. Cassandra told Lukie to "be the scribe, in those exact words" in front of her peers. *Id.* at 104:17-105:4.

> Q. Did you think that meant something other than take notes on the goals and objectives?
>
> A. Yeah because he wouldn't call anybody else a scribe and nobody else filled the role as scribe.

*Id.* at 105:19-24.

Lukie was "asked to attend meetings and take minutes, even meetings within risk management." Doc. 32.8 at 41:5-7. She "was always the one with the meeting minutes at staff meetings, there weren't other men that were asked to do that." *Id.* at 41:9-11. Lukie complained to Cassandra in 2014 that it was unfair to keep asking her to perform administrative duties. *Id.* at 45:17-23.

She told Cassandra "it was very time-consuming and it was impeding my ability to focus on what I was hired to do as a risk management professional." Doc. 32.8 at 42:21-24, 325:3-6. "I was frustrated in that I had to perform other responsibilities for men that were making more money than myself when they were able to take vacation, when I was working excessive hours and weekends on their work." *Id.* at 44:16-21. She told Cassandra she "felt like [she] was being treated more like a secretary." *Id.* at 51:4-8. Lukie told Cassandra that doing colors and fonts wasn't what she was hired to do. *Id.* at 116:19-23. "There were issues of Frank [Cassandra]'s direct reports, while they were men, they were paid more than myself, they were not able to deliver their work product." *Id.* at 383:2-5.

### D.    Lukie continues to receive stellar evaluations

In 2014, Cassandra's review wrote that "MaryBeth is the single top performer among my direct reports." Doc. 31.5 at 15. In 2015, Cassandra again wrote she had an excellent year, was his key "go to person," and was a "real asset to the organization." Doc. 31.5 at 20. He indicated she "[d]eveloped and had approved the new operational and emerging risk policies," "[e]nhanced the EMRIC assessment process," "[c]reated and built fundamental elements of new MIM risk management organization [including t]hree LoD training effectively implemented throughout organization with 94% completion across the Enterprise," all of which was "Excellent!" *Id.* at 19. He also noted she "[s]erved as 'secretary' for 2016 RAS working group keeping careful track of discussions, decisions, and parking lot items." *Id.* at 18.

Lukie earned this praise and maintained her excellent work evaluations even during a year in which she was dealing with extremely difficult personal issues outside of work. *See* Doc. 31.6 (emails regarding domestic violence incident against Lukie).

### E.    Lukie's bosses assure her that they'll remedy the sexist division of labor, but repeatedly break their promises

After Lukie opposed her feminized duties, Cassandra never remedied the situation. Doc. 32.8 at 46:6-9. In fact, "it got to be more and more." *Id.* at 46:13-14. Eventually, it got so bad that Lukie also told a higher up, Stan Talbi, that the administrative work she was being given was unfair. *Id.* at 47:20-48:14.

She actually attempted to resign during that timeframe, and Talbi "had called and asked me to stay and to give him the opportunity to make things better, because I was highly focused on administrative matters." *Id.* at 48:22-25. He "did ask me to stay and also alluded to that things would be getting better." *Id.* at 49:4-6. He said MetLife "would work on more evenly distributing the administrative type of work." *Id.* at 287:2-6. "I believed in Stan and Frank at the time, that they would make my situation better with repositioning some of the work so that I was not being treated unfairly or differently than other direct reports and that some of the administrative work would be shared with others and not just to myself." *Id.* at 298:6-13. "I believe that is discrimination, treating me differently than my male peers." *Id.* at 299:17-19.

11

**F.    Lukie asks to transfer from New Jersey to Tampa, Cox approves the move, Lukie begins reporting to him, and the discriminatory practices become worse**

In March 2016, due to her long commute and her work with individuals located in Florida, Lukie asked to transfer from New Jersey to the Tampa office. Doc. 32.8 at 221:19-222:9, 236:8-15. She asked Cassandra, who indicated he'd speak to Graham Cox. *Id.* at 232:5-232:16.

On or about March 29, 2016, Cox approved the transfer. *Id.* at 232:5-233:16. He didn't oppose the move; indeed, Lukie testified he "was fine because his philosophy is you can manage work and people from anywhere, you don't need to physically be in the same location." *Id.* at 233:5-16. Neither Cox nor Cassandra expressed any concern about how Lukie would oversee her three direct reports in New Jersey. *Id.* at 233:17-234:3. Lukie didn't actually begin working out of Tampa until September 26, 2016. *Id.* at 232:5-233:16.

In April 2016, Cox replaced Cassandra as Lukie's supervisor. Doc. 32.14 at ¶ 9, Doc. 32.8 at 26:4-10. Lukie remained the only female VP under Cassandra and Cox. Doc. 32.14 at ¶7-9. Under Cox, "it was worse," and she kept being asked to perform traditionally female administrative

duties in addition to her professional duties, to an even a greater extent than under Cassandra. Doc. 32.8 at 54:10-15, 352:16-19.

Under both Cassandra and Cox, Lukie was expected to assist in compiling their annual goals and objectives from their direct reports. Doc. 32.8 at 126:1-25. She'd "compile the direct reports information into a document, as well as provide my own content for the risk streams that I managed. And that was purely administrative, because no other direct reports were asked to take my information of content." *Id.* at 126:7-25. She'd compile all of the other direct reports' information into one document and cut-and-paste and spell check. *Id.* at 130:23-132:6.

During 2016's fourth quarter, Cox had Lukie attend meetings with other professionals who reported to him, specifically Injarjit Chatterji, in order to ensure that Chatterji did his job, "fulfilled his obligations," and to understand "what the deadlines and dates were so that documents could be delivered timely." Doc. 32.8 at 377:2-380:14. This, again, was a purely administrative assignment. *Id.*

When Cox replaced Cassandra, Dan DeKeizer took over Cox's former position dealing with international investments. Doc. 32.8 at 59:12-19. Cox handled domestic ERM, whereas DeKeizer handled international

ERM; together, they "covered all from a risk perspective." *Id.* at 60:9-15. Even though Lukie's VP role reported to Cox, not DeKeizer, Cox still required Lukie to attend DeKeizer's meetings so she could do administrative tasks for him. *Id.* at 59, 62:5-63:10.

She'd attend DeKeizer's meetings so she could draft his responses to regulatory agencies and make his edits. *Id.* at 62:5-63:10. She was asked to attend international meeting segments, even though she wasn't involved in international risk and, accordingly, wouldn't be contributing professionally from a risk perspective, so she could prepare DeKeizer's administrative materials. *Id.* at 64:9-65:20, 89:11-25, 91:7-17. DeKeizer would send her the risk appetite statements from various segments and ask her to fix the fonts and colors. *Id.* at 101:16-103:15.

### G.  Lukie again protests the sexist division of labor and tries to resign, but is again promised it'll improve

DeKeizer's administrative work occurred during 2016 and 2017. Doc. 32.8 at 61:17-25. Lukie complained to Cox it was unfair, "time-consuming, administrative and that it wasn't my responsibility to support Dan." *Id.* at 65:112-18, 68:12-20. Lukie asked Cox if DeKeizer, to whom she didn't report, "could assume responsibilities for his own work or use his own staff to do that work." *Id.* at 58:25-59:6. But Cox just told her to

"help out Dan." *Id.* at 77:5-17. Lukie also complained directly to DeKeizer that he should use his own people for administrative tasks; in response, he'd just give her more wordsmithing changes to make. *Id.* at 69:9-19.

But "an administrative assistant could have sat in those meetings and then just transcribed the notes that needed to be taken." *Id.* at 88:15-18. When asked if she complained about being required to do administrative work on the colors and fonts for the international segment appetite statements, she said she complained it was administrative and not her responsibility. *Id.* at 97:17-19. "I did not have the ability to focus on what my role is or was; rather, I was stuck doing colors and fonts for somebody that I did not report to." *Id.* at 97: 20-24. "Each segment had its own risk officer at my level that could have acted in the same capacity at my level, taken responsibility to develop their International or segment risk appetite statements." *Id.* at 98:8-13.

In June 2016, Lukie decided to resign because she was frustrated that she was still being asked to do administrative work when the other direct reports weren't. Doc. 32.8 at 297:23-298:24. But Cox and Cassandra asked her to stay. *Id.* Again, Cox "spoke a good game," and Lukie

15

believed he'd take action to ensure work was fairly allocated. *Id.* at 305:6-308:2.

Lukie was told "that men in the organization were technical in nature and you need to have more of a common-sense perspective, because they were technicians and actuaries, so their job was to be technical, whereas I was expected to be more of administrative and common sense." Doc. 32.8 at 114:16-23.

When asked if she ever "went to Mr. Cox to say that that work should not be done only by you, it should be divided," she replied, "Yes, I'm sure I did, because I was doing that for him as well as Stan." Doc. 32.8 at 128:23-129:6. She told Cox, "I just said this is administrative work and it's very time-consuming and that I wanted to focus on the job I was hired to do and that perhaps if you would be able to share that work with the other direct reports." *Id.* at 129:14-23. "[A]s far as my direct reports and peers, they were highly compensated and males and they should be responsible for their own work. Never once did Mr. Cassandra, Mr. Cox ask Scott Orr [another VP] to go draft [my] operational risk policy, go draft [my] specials, why don't you go create MaryBeth's slides." *Id.* at 147:21-148:5.

When asked whether she complained to anyone that Cassandra or Cox had engaged in disparate treatment based on sex, Lukie responded, "I would say from a discrimination perspective, yes, simply because of the role of the administrative work, the unfair distribution of that type of work among the direct reports, which were male, and myself, yes, I did." Doc. 32.8 at 350:6-17.

At deposition, MetLife's counsel asked Lukie, "[i]f Mr. Cassandra, Mr. Talbi, Mr. Cox, and everyone else who worked with you said that the administrative work was your favorite thing to do, how would you react to that?" Lukie responded, "[a]bsolutely not; I did complain several times about it, that was not my favorite thing to do. My expertise is in risk management; my favorite thing to do was heading up risk management for the third-party asset management business, MetLife asset management." *Id.* at 57:15-58:3.

### H.    Cox strips Lukie's MIM duties, transfers them to a male with no MIM experience who had left MetLife, and gives Lukie an administrative assignment instead, thereby constructively discharging her

Lukie went out on disability for approximately six weeks from February 16 through March 21, 2017. Doc. 32.8 at 275:4-8, 318:15-19. Doctors originally thought she had Parkinson's disease. Doc. 31.32.

17

In April 2017, Cox formally stripped Lukie's MIM risk stream and model governance and gave it to Orr, who had no experience with MIM. Docs. 32.14 at ¶ 25; 32.11 at 15:1-3, 17:10-12. Before he left in November 2016, Orr used to model MetLife's assets, develop investment strategies to manage them, and manage market and derivatives risk under the investment umbrella. Doc. 32.11 at 13. But Cox told Orr in February or March 2017 that he could have not just his old job back, but also a $20,000 raise plus a juicy new responsibility: the MIM risk function Lukie then held. Docs. 32.11 at 13:18-14:15, 18:1-7; 32.6 at 6. Orr accepted the offer. *Id.* at 15:19-24. In 2018, the MIM risk function was moved from him to someone else in part because it "became more active in third-party risk management." *Id.* at 16:12-20.

Since she worked under Cassandra, Lukie had been in charge of MIM. Doc. 32.8 at 245:14-22. "[W]hen I had MIM risk management, it was brand new, so there was a lot of work to be done in setting up the risk organization and in setting up the risk frame work, documenting risk committee charters, developing policies, so there was a lot of work that was done up-front simply because MIM was new." *Id.* at 167:15-22.

18

"MIM manages investments for a number of clients," and the MIM risk function was "focused on the risk of those clients and their portfolios"; in contrast, the risk management function outside of MIM was "focused on the risk of MetLife and the assets and liabilities of MetLife." Doc. 32.11 at 16:21-17:3. According to Cox, MIM "risk function was the body of responsibilities associated with monitoring, measuring and managing the risks that we took in our third-party investment management business." Doc. 32.10 at 34:7-11. This was Lukie's area of expertise. Doc. 32.8 at 176:13-177:25.

According to Lukie, there wouldn't be any derivative risk modeling in MIM because "the third-party asset management business, the biggest risk they face is operational risk." *Id.* at 164:3-21. There would be no need to do modeling analysis because MIM is a third-party asset manager and "it does not have derivatives." *Id.* at 165:13-18.

Lukie learned her MIM responsibilities were being stripped when Cox called her at 8:20 a.m. and said he needed to send out an email announcing that he was moving MIM to Orr by 9:00 a.m.; he gave her no rationale for the move. *Id.* at 217:13-218:6; Doc. 31.46. The only reason

Cox eventually gave Lukie for the change in an email dated May 9, 2017, was that he wanted someone local to manage Ray Liu. Doc. 31.47.

When Cox stripped Lukie's MIM responsibilities and gave them to Orr, Liu began reporting to Orr instead of Lukie. Doc. 32.8 at 159:16-20. Liu had been hired as the assistant vice president of MIM risk and reported to Lukie back in 2015. Doc. 32.12 at 11:2-18; 15:11-13. Liu said Lukie was "always there," "very diligent," "very knowledgeable," and had "a lot of experience coming from—and especially in the investments— investment management area, given her working in other companies and also given her long tenure working with investments." *Id.* at 15:16-23. Liu never noticed any problems with Lukie in 2016-2017. *Id.* at 21:8-10.

When MIM and Liu were stripped from Lukie, Jai Maxwell—who had no professional designations, no advanced degrees, and no background or expertise in risk—was assigned to Lukie for her to supervise instead. Doc. 32.8 at 168:16-23, 170:2-8, 248:19-22, 330:17-331:5. At that point, Lukie was no longer properly staffed. *Id.* at 328:21-329:11.

"Ray had, he is a CPA and CFA, as I mentioned, and Jai has no professional designations and no advanced degree." *Id.* at 331:2-5. "I was basically taken something of meaning and value that I established,

giving that to someone else who did not have that experience and giving me administrative support." *Id.* at 242:4-9.

At deposition, Cox explained for the first time—after litigation commenced—that he stripped Lukie's MIM responsibility because he "thought" that "Liu would benefit from having an on-site manager to help him improve his performance" and "the investments team would benefit from having a MIM risk leader that was co-located with them and on-site with them in the New Jersey office." Doc. 32.10 at 19:6-15. He further explained he "thought that the MIM risk function would benefit from taking a more quantitative approach." Doc. 32.10 at 19:6-15. But Liu testified that his deposition was the first time he'd ever heard anything about his performance needing any improvement. Doc. 32.12 at 14:15-4.

Cox also testified he thought MIM risk management improved after he transferred it to Orr. Doc. 31.4 at 34:17-23. But Liu testified he was disappointed when he found out MIM was being taken from Lukie because he thought they were doing a fine job together, that Lukie had the "expertise to be in that role," that he had less assistance when Orr became his direct supervisor than he did under Lukie, and that the

attention Orr gave to MIM risk was "lacking" as Orr was "juggling two priorities." Doc. 32.12 at 16:25-17:6; 23:4-7; 18:20-19:8.

Describing Lukie as an employee, Cox testified "[a]t the beginning when MaryBeth began reporting to me, she was very diligent; she was conscientious; her performance was good. It was in late 2016 when I started to notice the changes in behavior and then into the beginning of 2017, when her job performance and behavior generally became much more erratic." Doc. 32.10 at 14:11-17.

Lukie's annual review, however, told a different story; Cox gave her a rating of "exceeds expectations" for the 2016 year. Doc. 31.5 at 21. Lukie's annual reviews were done in February or March of the year following the year being reviewed. Doc. 32.8 at 29:10-15. Further, in an email dated Friday, March 3, 2017, Cox wrote to MaryBeth, "Thanks for a productive year in 2016. You'll note that the company performance factor for AVIP was 85%, so you should review your payout rate relative to that level. Since you are getting more than 85%, that reflects well on your personal performance." Doc. 31.35.

On May 9, 2017, after having her MIM duties stripped, Lukie handed in her final letter of resignation. Doc. 32.14 at ¶¶ 26-27. Cox

conceded that her emailed resignation said she didn't want to do administrative work anymore. Doc. 32.10 at 18:25-19:5.

Although the removal of Lukie's MIM duties didn't reduce her base pay, it could've affected her year-end bonus. Doc. 32.8 at 279:6-20. Lukie complained about the stripping of her MIM duties to Cassandra, who suggested she ask for a severance package as they were having layoffs and her role had become very administrative. *Id.* at 176:18-177:8.

Liu believed Lukie left the company because she lost the MIM risk stream. Doc. 32.12 at 17:22. He knew she wasn't happy with "what she is doing sometimes," "compiling stuff and putting stuff together," "like putting slides together, changing some of the slide formatting and all that stuff." *Id.* at 22:2-4. Orr also confirmed that Lukie did complain to him that she was being assigned administrative roles. Doc. 32.11 at 22:3-10, 17-18. Lukie told Orr she was unhappy with her position because it wasn't her function, but instead was more supporting her management. *Id.* at 18:18-22. She told him the work Cox gave her was too administrative. *Id.* at 22:8-9, 17-22.

Orr became an SVP in June 2018, one year after he inherited Lukie's duties. Doc. 32.11 at 7:13-17.

## I.    MetLife constantly pays Lukie less than her male VP peers

Cassandra told Lukie he was trying to bring her up to par with her peers because her pay was not "in line." Doc. 32.8 at 26:21-25. Cassandra wrote that "MaryBeth is the single top performer among my direct reports" for the 2014 year. Doc. 31.5 at 15. But she was being compensated far less than her male peers:

| Year | Marybeth Lukie (MBA, CPA, not Actuary) | Howard Kurpit (no MBA, no CPA, Actuary) | Scott Orr (Masters, no CPA, Actuary) | Rob Semke (no MBA, no CPA, not Actuary) |
|------|------|------|------|------|
| **2015** | $240,000 | $292,000 | $317,130 | $261,000 |
| **2016** | $251,000 | $297,000 | $320,130 | $269,000 |
| **2017** | $259,000 | $304,000 | $340,000 | $275,725 |

### 1.    Lukie is paid less than Orr, Semke, and Kurpit

For instance, as of April 1, 2015, Lukie was being compensated at an annual base pay of $240,000 (Doc. 32.4), while Orr was being compensated at an annual base pay of $317,130 (Doc. 32.6 at 5). Orr was VP of market risk and derivatives under SVPs Evangel, Cassandra, and Cox. Doc. 32.14 at ¶12. Lukie testified that Orr was at the exact same level as her in 2016. Doc. 32.8 at 148:13-16. Orr agreed that he and Lukie were "peers" who were responsible for different risk functions. Doc. 32.11 at

24

23:5-6. He was in charge of market risks and derivatives risk. *Id.* In 2016, Orr was being compensated at an annual base pay of $320,130 (Doc. 32.6 at 6), while Lukie was being compensated at an annual base pay of $251,000 (Doc. 32.4 at 5). When Orr left MetLife in 2016, he had been given a rating of only "meets expectations," while Lukie was given a rating of "exceeds expectations." Docs. 32.11 at 23:18-20; 31.5 at 21.

Semke was VP of operational risk and governance under SVP Evangel. Doc. 32.14 at ¶ 12. In 2015, he was being compensated at an annual base pay of $261,000. Doc. 32.7 at 5. Semke didn't have Lukie's professional designations and had a smaller pool than Lukie did. Doc. 32.8 at 150:2-21. Semke had just operational risk while Lukie testified, "I had a much bigger role; besides operational risk, I also headed up third-party asset management risk and governments, so I had much more of a role than Mr. Semke and much more designations and paid less." *Id.* at 155:9-18. As of April 1, 2016, Lukie was being compensated at an annual base pay of $251,000, while Mr. Semke was being compensated at an annual base pay of $269,000. Docs. 32.4 at 5; 32.7 at 5.

Kurpit was VP of economic capital under SVP Evangel. Doc. 32.14 at ¶ 12; 32.11 at 12:22-23. In 2015, he was being compensated at an annual base pay of $292,000. Doc. 32.5 at 5.

> **2. Each male VP reports to the same executive, manages the same average number of employees, and has similar responsibilities, but less tenure**

Each VP was a direct report to the Head of ERM. Doc. 32.14 at ¶ 16. The VPs had their own risk stream within MetLife that they managed, but each VP managed the same average number of employees and had the same overall responsibilities for day-to-day functions and responsibilities for their own risk streams. *Id.* at ¶ 14.

Semke and Kurpit, however, had less tenure than Lukie. *Id.* at ¶ 16. Although Orr and Lukie originally had similar tenure, Orr left MetLife in 2016 and, thus, had less tenure than Lukie when he was asked to return in 2017. *Id.* Also, Lukie had extensive prior external third-party asset management experience. *Id.*

> **3. MetLife has an actuarial pay scale, an investments pay scale, and a corporate pay scale**

Although Lukie believed actuaries were paid more than non-actuaries, she clarified that "in addition to the actuarial pay scale, there was an investments pay scale which is higher than the corporate pay scale

26

that I was on." Doc. 32.8 at 38:10-19. Lukie, "did from a risk perspective support investments," and "other individuals within risk management that were on the investments pay scale and being compensated at higher levels than myself" that weren't actuaries. Doc. 32.8 at 38:15-19.

### 4. Actuarial training in insurance mathematics wasn't important to run MIM risk

An actuary is a professional trained in insurance mathematics. Doc. 32.9 at 10:7-8. Cox and Orr conceded that to run MIM risk, it wasn't necessary or important to be an actuary. Docs. 32.10 at 23:21-23; 32.11 at 21:10-12.

### J. The district court grants summary judgment against Lukie's sex discrimination and retaliation claims

Using language that suggested it was *weighing* the evidence instead of merely *assessing* it for genuine disputes of material fact, the district court granted MetLife summary judgment.[4] Doc. 40.

---

[4] The district court also granted summary judgment to MetLife on count two's hostile work environment claim as time-barred. Doc. 40 at 10. This appeal doesn't challenge that ruling.

### 1. Count one's sex discrimination pay claims are rejected because Lukie's male comparators supposedly weren't similarly situated in all material respects

The district court rejected count one's discrimination claim based on disparate pay because Lukie supposedly failed to make out a prima facie case of discrimination. *Id.* at 6. That was because, the district court said, her comparators weren't similarly situated "in all material respects." *Id.*

Specifically, it ruled Kurpit and Orr weren't proper comparators because they were actuaries, and MetLife paid actuaries more. *Id.* It ruled Semke wasn't a proper comparator because he had a different area of expertise, and Lukie didn't know what Semke did on a day-to-day basis. *Id.* As a final backstop, even if Lukie lacked comparators, it ruled her circumstantial evidence didn't establish a "convincing mosaic" of discrimination. *Id.* at 7.

In making these rulings, the district court never considered whether a reasonable juror could find (1) Kurpit, Orr, or Semke were similarly situated in all material respects, or (2) a convincing mosaic of discrimination. *See id.* at 5-8.

### 2.   Count one's sex discrimination assignments claims are rejected because they supposedly weren't adverse employment actions

The district court also rejected count one's claim that Lukie's excessive administrative assignments were discriminatory. Doc. 40 at 10. It so ruled because they supposedly weren't "adverse employment actions" but, instead just "ordinary workplace tribulations." *Id.*

### 3.   Count three's retaliation claims are rejected because there supposedly was no causation, pretext, or constructive discharge

Finally, the district court rejected Lukie's retaliation claims. Doc. 40 at 13. It reasoned there was no evidence of a complaint that closely preceded Cox's removal of her MIM duties to Orr in April 2017. Doc. 40 at 13. Thus, it ruled Lukie couldn't prove a causal connection between her protected activity and the adverse employment action. *Id.*

Even if Lukie established a prima facie case, the district court further ruled MetLife had legitimate, nonretaliatory reasons for Cox's decision. *Id.* at 16. And supposedly no evidence indicated those reasons were pretextual. *Id.* As a final backstop, the district court ruled Lukie's evidence didn't rise to the level required to establish that she was constructively discharged. *Id.* at 16.

*Standard of review*

Summary judgment rulings are reviewed de novo. *Crawford v. Carroll*, 529 F.3d 961, 964 (11th Cir. 2008).

## SUMMARY OF THE ARGUMENT

The district court committed elementary procedural errors when it lost sight of its limited role at summary judgment. Instead of merely assessing the evidence to identify any jury issues, it instead weighed the evidence, thereby conducting an unauthorized a bench trial on the papers. That's not how summary judgment works.

1.    The district court erred when it granted summary judgment on count one (sex discrimination). This claim proceeded on two legal theories: (1) disparate pay; and (2) sexist division of labor. Paralleling these theories, there were two genuine disputes of material fact upon which a reasonable jury could find for Lukie. The first was whether Lukie was similarly situated in all material respects to three male VPs being paid more than her. The second was whether MetLife committed an adverse employment action when it continually assigned Lukie, but not male VPs, feminized administrative and secretarial duties.

2.    The district court also erred when it granted summary judgment on count three (retaliation). There was a genuine dispute of material fact whether MetLife stripped her of her MIM duties and gave them to a male because she had complained about the sexist division of labor. The district court misdescribed the record when it ruled no complaint closely preceded Cox's stripping of Lukie's MIM duties.

## ARGUMENT AND CITATIONS OF AUTHORITY

## I.    MetLife sexually discriminated against Lukie by paying her less than male colleagues and requiring her to perform traditionally feminized secretarial and administrative tasks (count one)

Viewed in Lukie's most favorable light, the evidence established that MetLife paid her less than male colleagues while requiring only her—not them—to perform traditionally feminized secretarial and administrative tasks. That's sex discrimination.

### A.    Sex discrimination claims under the Florida Civil Rights Act are assessed under *McDonnell Douglas*'s burden-shifting framework

The Florida Civil Rights Act ("FCRA") protects personal dignity by securing "for all individuals within the state freedom from discrimination because of race, color, religion, sex, national origin, age, handicap, or marital status." Fla. Stat. § 760.01(2); *accord Woodham v. BCBS of Fla.,*

*Inc.*, 829 So. 2d 891, 894 (Fla. 2002). It's a remedial statute that "should be liberally, not strictly, construed." *Speedway SuperAmerica, LLC v. Dupont*, 933 So. 2d 75, 86 (Fla. 5th DCA 2006).

It's modeled after Title VII, which likewise prohibits sex-based workplace discrimination. Fla. Stat. § 760.10; *Joshua v. City of Gainesville,* 768 So. 2d 432, 435 (Fla. 2000); *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1526 (11th Cir. 1992); *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998) (FCRA claims are analyzed like Title VII claims); *Dupont*, 933 So. 2d at 79. "In forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." *Miranda*, 975 F.2d at 1528 (quoting *Washington County v. Gunther*, 452 U.S. 161 (1981)).

At summary judgment, courts analyze sex discrimination claims based on circumstantial evidence via the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *accord Alvarez v. Royal Atl. Devs., Inc.,* 610 F.3d 1253, 1263 (11th Cir. 2010). A prima facie case requires two showings: first, that the employee was a qualified member of a protected class who was subjected to an adverse

employment action; and second, that similarly situated employees outside the protected class were treated more favorably. *Id.* at 1264.

These elements are flexible and "should be tailored, on a case-by-case basis, to differing factual circumstances." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1123 (11th Cir. 1993) (citing BARBARA SCHLEI & PAUL GROSSMAN, EMPLOYMENT DISCRIMINATION LAW 476 (2d ed. 5-Year Cum. Supp. 1989)). Once the prima facie case is established, a rebuttable presumption of discrimination arises. *Alvarez,* 610 F.3d at 1264; *USPS Bd. of Gov. v. Aikens,* 460 U.S. 711, 714 (1983).

The burden of production then "[s]hifts to the employer to articulate some legitimate, nondiscriminatory reason" for its actions. *McDonnell Douglas*, 411 U.S. at 802; *Alvarez,* 610 F.3d at 1265.

If the employer does so, the burden shifts back to the plaintiff to "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (citing *Tex. Dep't of Cmty.*

*Affairs v. Burdine,* 450 U.S. 248, 254-55 (1981)); *Alvarez,* 610 F.3d at 1265.

At all times, ordinary summary judgment standards apply, so courts should merely *assess* evidence to identify genuine disputes of material fact rather than *weigh* evidence. *Jameson v. Arrow Co.,* 75 F.3d 1528, 1531 (11th Cir. 1996), *abrogated on other grounds by O'Connor v. Consol. Coin Caterers Corp.,* 517 U.S. 308, 312-13 (1996).

### B. MetLife discriminated against Lukie when they paid her less than the male VPs, who were similar to her in all material respects

A Title VII plaintiff establishes a prima facie case of sex discrimination "by demonstrating that she is female and that the job she occupied was similar to higher paying jobs occupied by males." *Miranda*, 975 F.2d at 1529.

MetLife didn't dispute that "disparate pay is an adverse employment action," *Bowen v. Manheim Remarketing, Inc.*, 882 F.3d 1358, 1363 (11th Cir. 2018), or that Lukie was being paid less than her putative comparators, Orr, Semke, and Kurpit. Rather, MetLife argued that the male VP comparators weren't similar in all "material" respects. *Lewis v. City of Union City*, 918 F.3d 1213, 1226 (11th Cir. 2019) (en banc). And the

district court agreed. Doc. 40 at 7. But the district court failed to recognize that "there is a relaxed standard of similarity between male and female-occupied jobs." *Calicchio v. Oasis Outsourcing Group Holdings, LP,* 2022 WL 2761720, at *3 (11th Cir. July 15, 2022) (citing *Miranda*, 975 F.2d at 1526).

*Lewis*'s standard must be applied on a case-by-case basis "in the context of individual circumstances." *Lewis*, 918 F.3d at 1226-27. A comparator needn't be identical or have "precisely the same title." *Id.* at 1227. "Nor will minor differences in job function disqualify a would-be comparator." *Id. Lewis* instructs that a similarly situated comparator will engage in the same basic conduct and have the same supervisor as the plaintiff. *Id.* at 1227-28. Here, Lukie held the same title, engaged in the same basic conduct, and had the same supervisor at certain times as the comparators. *See* Doc. 32.14.

Moreover, *Lewis* wasn't a disparate pay case and, accordingly, the disparate pay cases from this Court are most instructive on this issue. In *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 599 (11th Cir. 1994), this Court held that a plaintiff raised a genuine dispute of material fact sufficient to defeat summary judgment with regards to the similarity of her

position as Vice President of Administration (since 1981) with another corporate department Head of Investigations (since 1988) for purposes of her Title VII disparate pay claim. Although the administrative and investigative positions were different, both jobs were fairly described as "corporate department heads" and both reported to defendant's president. *Id.* at 593. That raised a jury question about disparate pay. *See id.*

Similarly, Lukie presented evidence that her comparators were similar in all material respects. First, they were all VPs who reported to the same SVP as Lukie at certain points in time, all under the same ERM umbrella. Doc. 32.14. There were only four other VPs besides Lukie reporting to SVP Evangel (including Kurpit, Orr, and Semke), only three other VPs besides Lukie reporting to SVP Cassandra (including Orr), and only two other VPs also reporting to SVP Cox (including Orr). Docs. 32.14; 32.2. Lukie presented evidence that the SVPs were only two levels below MetLife's CEO. Doc. 32.8 at 107 (Cox reported to Talbi, who then reported to MetLife's CEO). In the context of senior executive very high up on the corporate ladder like Lukie, the other VPs who report to the same SVP are the closest comparators that exist. *See Lewis*, 918 F. 3d at 1227 (a

similarly situated comparator will ordinarily have "been under the jurisdiction of the same supervisor as the plaintiff").

True, each VP had expertise in their own area.[5] *See* Doc. 32.8 at 154:23-155:5. But those specializations don't preclude them from being considered "similarly situated" because they were at the same level on the corporate hierarchy and all reported to the same SVPs under the same ERM leadership umbrella. *See Mulhall*, 19 F.3d at 593-99; *accord Hall v. Ala. State Univ.*, 2022 WL 2195021, at *1-3 (M.D. Ala. June 17, 2022) (men's baseball coach was sufficient comparator for women's softball coach). Further, each VP managed the same average number of employees and had the same overall responsibilities for day-to-day functions and responsibilities for their own risk streams. Doc. 32.14 at ¶14.

Here, if VPs heading up different risk streams were excluded as comparators due to their different areas of expertise, then no similarly situated comparator would exist, and MetLife could discriminate against

---

[5] Semke was the VP of Operational Risk and Governance under Evangel; Kurpit was the VP of Economic Capital under Evangel; and Orr was VP of Market Risk and Derivatives under Evangel, Cassandra, and Cox. Doc. 32.14 at ¶12. Similarly, Lukie was the VP of Regulatory and Model Risk, MIM Risk and Operational Risk under Evangel and the VP of Operations, Regulatory Risk and Governance, and MIM Risk under both Cassandra and Cox. *Id.* at ¶ 7-9.

Lukie (or any of her colleagues) regarding pay with no consequences. For example, *Miranda* explained that *Gunther,* 452 U.S. 161, declined to rule that the Bennett Amendment restricted Title VII to claims for equal pay for equal work, which is "the only disparity forbidden by the Equal Pay Act." 975 F.2d at 1527. Such a restriction would have meant "that a woman who is discriminatorily underpaid could obtain no relief—no matter how egregious the discrimination might be—unless her employer also employed a man in an equal job in the same establishment, at a higher rate of pay." *Id.*

Further, Lukie had longer tenure than her comparators. Doc. 32.14 at ¶ 16. At summary judgment, courts must credit nonmovants' evidence "even if, as is often the case, the plaintiff's evidence consists primarily or solely of her own self-serving sworn statements or testimony." *Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1351 (11th Cir. 2022); *accord Edwards v. Shanley*, 666 F.3d 1289, 1295 (11th Cir. 2012) (genuine dispute of material fact whether police dog bit suspect for 5-7 minutes precluded summary judgment).

Lukie also had better reviews than her comparators. Lukie received nothing short of superior evaluations and performance ratings of "leading

contributor," "outstanding," and "exceeds expectations" on her annual reviews (Doc. 31.5), and Cassandra wrote she was "the *single top performer among my direct reports*" for the 2014 year. *Id.* at 15 (emphasis added)). Yet Orr (a fellow VP who also reported to Cassandra and received only a "meets expectations" rating when he left in 2016) was paid a base salary of $317,130 for 2015, whereas Lukie (who received stellar evaluations) was paid a base salary of only $240,000. Docs. 32.6 at 5; 32.4; 32.11 at 23:18-20.

Although Lukie testified that actuaries were on a different pay scale, and a jury would be free to consider Orr's actuary status, this fact alone doesn't eliminate him as a comparator, especially in light of Lukie's testimony that MetLife had other higher pay scales that didn't require employees to be actuaries. Doc. 32.8 at 38:3-19; *see, e.g.*, *Bowen*, 882 F.3d at 1363 ("[o]nce [the plaintiff] established herself as an effective arbitration manager, prior salary and prior experience would not seem to justify treating her different" than the male arbitration manager (citing *Mulhall*, 19 F.3d at 596)). Also, Cox and Orr conceded that, to handle the MIM risk stream, it wasn't necessary to be an actuary. Docs. 32.10 at 23:21-23; 32.11 at 21:10-12.

Lukie also presented evidence that Semke had a smaller pool than she did. Doc. 32.8 at 155:9-18. He had "just operational risk," whereas Lukie had operational risk plus third-party asset management risk and governments. *Id.* "I had much more of a role than Mr. Semke and much more designations and paid less." *Id.* Semke lacked Lukie's professional designations (Doc. 32.8 at 150:2-151:5), yet he was paid more.

Accordingly, Lukie has raised a genuine issue of material fact as to whether she was paid less than the male VPs because she is female. A jury should resolve that dispute, not a district court. The district court erroneously decided at summary judgment that the actuary pay scale and Lukie's testimony that she didn't know what Semke did on a day-to-day basis were entitled to more weight than the other evidence. Doc. 40 at 6-7. The evidence that all the VPs were at the same high corporate level reporting to the same supervisor, there were other higher pay scales that did not require one to be an actuary, Lukie's evaluations were better than the comparators, her tenure was longer, and she had more experience rendered summary judgment improper. It was for a jury to weigh those similarities and differences, not a court.

Intentional discrimination is an "elusive factual question" because an employer's "true motivations" are difficult to establish. *Mulhall*, 19 F.3d at 598 (citing *Hairston v. Gainesville Sun Pub. Co.,* 9 F.3d 913, 919 (11th Cir.1993), and *Aikens,* 460 U.S. at 716). Thus, it's "generally unsuitable for disposition at the summary judgment stage." *Id*. Unsurprisingly, such cases are often remanded for trial, particularly when other evidence suggests discriminatory intent.

For example, in *Miranda*, this Court held an employer's president's statement that "any third man would be astounded to have the title I'm giving you" indicated that he didn't see the plaintiff "in the same light" as the other male buyers. 975 F.2d at 1529. It also revealed an attitude "on the part of the company president that plaintiff had no right to expect to be paid a buyer's wages for work which was at least similar to that performed by the other full buyers, all of whom were male." *Id*.

Similarly, in *Bowen*, the plaintiff "presented evidence which indicated that her employer's general managers were influenced by sex bias in personnel matters, including but not limited to the wage context." *Reddy v. Dep't of Educ., Ala.*, 808 Fed. App'x 803, 813 (11th Cir. 2020) (citing *Bowen*, 882 F.3d at 1363).

41

Here, the statements that Lukie should "be the scribe," that men were "more technical" in nature, and that her pay was not "in line" with the other VPs all support Lukie's position that she was being treated unlike the men, including being paid less, because she was female. Doc. 32.8 at 26:21-25, 104:17-105:4, 114:16-23; s*ee also Walker v. City of Hapeville*, 2009 WL 10665771, at *10 (N.D. Ga. June 17, 2009) (sexist terminology is evidence of gender animus). The constant feminized secretarial and administrative work assignments to her as the only female VP further evidence discriminatory intent.

In short, the evidence was "not so one-sided" that MetLife "must prevail as a matter of law." *Bowen,* 882 F.3d at 1362. Instead, a reasonable jury could find in favor of Lukie on her discriminatory pay claim.

## C.    MetLife also sexually discriminated against Lukie when it required her to perform feminized secretarial and administrative tasks, unlike her male colleagues

Lukie's additional feminized administrative and secretarial duties, on top of her professional duties, were sex discrimination. The district court erred in ruling otherwise.

"Title VII gives us no license to decide that any injury, however insignificant, may be regarded as de minimis." *Cox v. Am. Cast Iron Pipe*

*Co.*, 784 F.2d 1546, 1561 (11th Cir. 1986). "What is small in principal is often large in principle." *Id.* (quoting *Jenkins v. United Gas Corp.*, 400 F.2d 28, 32–33 (5th Cir.1968)).

Sufficient evidence would've permitted a reasonable jury to find MetLife discriminated against Lukie when it required her, but not male VPs, to constantly perform demeaning, feminized secretarial tasks. The district court erred in taking that decision away from a jury when it ruled those tasks were "ordinary workplace tribulations." Doc. 40 at 10.

## 1.    The additional feminized duties were sex discrimination

Sex discrimination isn't limited to actions resulting in economic loss, as the district court mistakenly believed. Doc. 40 at 8-10 (rejecting assignments claim as "ordinary workplace tribulations" that didn't affect Lukie's paycheck or advancement). It includes much more. *See Cox*, 784 F.2d at 1561 ("Job titles and duties themselves are conditions of employment protected by Title VII.").

For example, it was sex discrimination when a female NASA pilot with a master's degree in physiology was being increasingly assigned menial secretarial tasks like answering phones, typing, and filing. *Smith v. Fletcher*, 559 F.2d 1014, 1017-18 (5th Cir. 1977) (affirming judgment

43

after *de novo* bench trial).[6] Similarly, it was sex discrimination to require a female employee to "wear makeup because she appears less attractive when pregnant, even though the employer had no such requirement of plaintiff or any other employee prior to plaintiff's pregnancy." *Tamimi v. Howard Johnson Co.*, 807 F.2d 1550, 1554 (11th Cir. 1987).

## 2. The additional feminized duties were adverse employment actions

Requiring Lukie to perform additional feminized duties effectively reduced her pay, prestige, and professional responsibilities. Thus, they were adverse employment actions.

### a. Many employment actions qualify as adverse

An adverse employment action is a "serious and material change" in the "terms, conditions, or privileges of employment" as viewed by a reasonable person under the circumstances. *Hinson v. Clinch County, Ga. Bd. of Educ.*, 231 F.3d 821, 829-30 (11th Cir. 2000). The test is whether "a reasonable person in [the plaintiff's] position would view the employment action in question as adverse." *Id.*

---

[6] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down as of September 30, 1981.

Thus, any employment action that "involves a reduction in pay, prestige or responsibility" can be considered adverse. *Id.* at 829 (despite same pay, teacher suffered a loss of prestige and responsibility by being transferred from principal to a teaching position); *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 921 (11th Cir. 2018) (failure to transfer plaintiff to information technology job constituted adverse employment action where it carried additional prestige).

The adverse employment action doesn't have to be final, either; it covers actions that "fall short of ultimate decisions," such as transfers, denial of transfers, and poor performance evaluations. *Wideman v. Wal-Mart Stores, Inc.,* 141 F.3d 1453 (11th Cir. 1998); *accord Jefferson*, 891 F.3d at 921; *Hinson,* 231 F.3d at 829; *Gillis v. Ga. Dep't of Corr.,* 400 F.3d 883, 888 (11th Cir. 2005).

And the employment action doesn't require proof of "direct economic consequences." *Davis v. Town of Lake Park, Fla.,* 245 F.3d 1232, 1239 (11th Cir. 2001); *see also Hinson*, 231 F.3d at 829-30 (principal's transfer to teacher's position was adverse employment action despite her pay remaining identical because a reasonable factfinder could still find loss of prestige and responsibility).

45

### b.    MetLife's assignment of feminized duties qualified as adverse employment actions

A reasonable VP in Lukie's position would view the constant requests and expectations to perform traditionally female administrative duties in addition to her professional duties as a material and serious change in the condition of her employment. Thus, a genuine dispute of material fact precluded summary judgment on this issue. *See Smith*, 559 F.2d at 1017-18 (supervisors assigned female NASA "increasingly menial tasks" considered "secretarial and 'typically female'" like "answering the telephone, typing, filing, opening and logging the incoming mail").

The district court ruled Lukie failed "to explain how these tasks and others assigned to her constitute adverse employment actions." Doc. 40 at 9. Not so. Lukie actually testified she had to work harder and longer and would work weekends while the men were vacationing because these administrative tasks were required *in addition* to her professional duties. Doc. 32.8 at 44:16-21. This administrative work affected her risk work for which she was hired. *Id.* at 44:11-45:6. She had to do work for the men beyond her responsibility, such as writing their policies, developing their board materials, and preparing their presentations and slides. *Id.* at 40:22-41:11, 43:17-24. Although attending the international segment

46

meetings wasn't part of her professional job, for example, Cox nevertheless demanded she attend to take notes for DeKeizer, to whom she didn't report. *Id.* at 77:4-17. These feminized tasks were demeaning, the male VPs weren't asked to do them, and they were in addition to her professional VP duties.

Similarly here, the requirement that Lukie serve in a secretarial or administrative role both increased her workload and involved a substantial loss of prestige. *See Fletcher*, 559 F.2d at 1017-18. No professional in a VP's position would reasonably believe otherwise. Lukie testified that Cassandra wouldn't call anyone else a scribe, and nobody else fulfilled that role. Doc. 32.8 at 105:19-24. Lukie was required to act as a secretary to other male professionals, whereas male VPs weren't required to do so. Lukie was the only female VP and the only VP expected to perform these traditionally female jobs despite her MBA and CPA.

Essentially, Lukie was denied the VP position that male VPs held, which didn't require secretarial responsibilities. Lukie had to attend meetings that she wouldn't have otherwise been professionally required to in order to take notes and make pretty PowerPoints. Any reasonable VP in Lukie's position faced with a choice between a VP position with the

added traditionally female secretarial responsibilities or a VP position that the men held without such responsibilities would choose the latter.

The district court relied heavily on *Davis,* 245 F.3d 1232, in ruling these secretarial tasks weren't adverse employment actions. Doc. 40 at 8-9. Its reliance was misplaced. The plaintiff in *Davis* received a negative counseling memorandum that resulted in no "tangible consequences" and, thus, didn't materially impact his employment's terms and conditions. *Id.* at 1242-43. In contrast, Lukie testified that the constant administrative duties required her to work harder and longer than the male VPs and interfered with her professional job. The administrative duties did have tangible consequences and did alter the terms and conditions of her employment.

"[I]ntent can in some situations be inferred from the mere fact of differences in treatment." *Giles v. Ireland*, 742 F.2d 1366, 1374 (11th Cir. 1984). Here, where Lukie was the only female VP and the only VP asked to perform these traditionally female administrative and secretarial tasks, an inference of intent to assign this extra work based on her sex is appropriate, especially in light of the comments that she "be the scribe" and that men are "more technical" in nature.

The district court erred here in determining that the administrative assignments weren't adverse employment actions where a reasonable jury could find under the facts presented that they were. The assignments seriously and materially changed Lukie's VP role by requiring her to expend more time working because she was carrying an additional administrative job on top of her VP job and by reducing the prestige normally associated with such a VP position held by a professional with an MBA and CPA. *See Fletcher*, 559 F.2d at 1017-18.

These weren't ordinary workplace tribulations. Were the tables turned with a male VP with an MBA and a CPA being asked to take notes for female bosses and female colleagues at meetings outside his professional area, there would be no questioning the absurdity. The FCRA was intended to preserve the dignity of all, including female MBAs and CPAs who have earned the right to not have to play secretary to supposedly "more technical" male colleagues. Summary judgment on this issue was incorrect.

## D.   At minimum, Lukie established a "convincing mosaic" of discrimination

Even if Lukie lacked any similarly situated comparators, she still established a "convincing mosaic" of MetLife's discrimination.

49

Establishing the elements of the *McDonnell Douglas* framework is a "sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Aikens*, 460 U.S. at 715 (citing *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577 (1978)). But it "is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011); *accord Sims v. MVM, Inc.,* 704 F.3d 1327, 1333 (11th Cir. 2013).

A plaintiff's failure to produce an ideal comparator "does not necessarily doom the plaintiff's case." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (quoting *Smith*, 644 F.3d at 1328). Obviously, "[n]ot every employee subjected to unlawful discrimination will be able to produce a similarly situated comparator." *Id.* Nevertheless, "[e]ven without similarly situated comparators," a plaintiff will always survive summary judgment "if he [or she] presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.* To do so, plaintiffs can present a "convincing mosaic of circumstantial

evidence from which a factfinder can infer discriminatory motivation." *Id.*; *accord Lockheed-Martin*, 644 F.3d at 1328.

That is, plaintiffs "may use 'non-comparison circumstantial evidence to raise a reasonable inference of intentional discrimination' and thereby create a triable issue." *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1255 (11th Cir. 2012) (quoting *Hamilton v. Southland Christian School, Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012))). "A 'convincing mosaic' may be shown by evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements ..., and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis*, 934 F.3d at 1185.

Here, Lukie's testimony and evidence, which must be viewed in her most favorable light, was sufficient to permit a reasonable juror to infer discriminatory motivation. Even though she had more tenure than the men, had attended a Harvard University leadership training, was consistently given the highest ratings, and was the "single top performer" under Cassandra, she *still* was paid significantly less than the male VPs,

one of whom was rated lower on his annual review the next year. Even Cassandra admitted Lukie's pay wasn't "in line" with her colleagues.

As for the administrative assignments, Lukie was expected to play secretary not only for her male boss, but for male superiors whom she did not report to as well as male peers, all in addition to fulfilling her professional duties as VP of Operations, Regulatory Risk and Governance and MIM Risk. The male VPs weren't expected to do this. Her male boss thought she should "be the scribe" and she was told that men were more "technical" in nature. And this was at a company that had, in the past, tolerated such comments as "go bake a cake," "keep your legs crossed," and "is that a banana in my pants." The demeaning assignments required her to work longer and harder and interfered with her professional responsibilities.

Summary judgment is inappropriate because a reasonable juror could infer discriminatory motive. *See Lewis*, 934 F.3d at 1185-87.

## II.    MetLife retaliated against Lukie for complaining about the sexist division of labor when Cox constructively discharged her by stripping her MIM duties and giving them to an inexperienced male (count three)

Viewed in Lukie's most favorable light, the evidence established that when she complained about the sexist division of labor, MetLife

constructively discharged her by stripping her of a key professional duty, giving it to a male with no MIM experience, and assigning her yet another administrative duty. That's retaliation. The district court's ruling that no complaint closely preceded Cox's transfer of the MIM work (Doc. 40 at 13) misdescribed the record.

### A. To prove retaliation, a plaintiff must show a causal link between her statutorily protected expression and an adverse employment action

Under the FCRA's anti-retaliation provision, an employer cannot retaliate against an employee because she has opposed an unlawful employment practice. Fla. Stat. § 760.10(7); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) (Title VII); *Smith v. City of Fort Pierce, Fla.,* 565 Fed. App'x 774, 776 (11th Cir. 2014) (Title VII's anti-retaliation framework applies also to FCRA claims).

To establish a prima facie case of retaliation, a plaintiff must show (1) she engaged in statutorily protected expression, (2) she suffered an adverse employment action, and (3) a causal link existed between the two. *Matamoros v. Broward Sheriff's Office*, 2 F.4th 1329, 1336 (11th Cir. 2021); *see also Beltrami v. Special Counsel, Inc.,* 170 Fed. App'x 61, 62 (11th Cir. 2006) (Title VII). A causal link exists if "the relevant

decisionmaker was aware of the protected conduct," and "the protected activity and the adverse actions were not wholly unrelated." *Patterson*, 38 F.4th at 1351 (citing *Jones v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1271 (11th Cir. 2017)).

The district court assumed Lukie had engaged in statutorily protected expression and had  suffered an adverse employment action when Cox stripped her MIM duties. Doc. 40 at 12-13. Still, it ruled Lukie couldn't establish a causal connection between her complaints and her MIM duties' removal because her complaints hadn't closely preceded Cox's MIM transfer. *Id.* That's wrong.

## 1. Cox was aware of Lukie's complaints when he stripped her MIM duties

Lukie complained about the discriminatory administrative work in 2016 and 2017 to Cox before he removed her MIM duties. *E.g.*, Doc. 32.14 at ¶ 19. Lukie reported to Cox only from April 2016 through May 2017. Doc. 32.14 at ¶¶ 9, 26. Lukie's MIM duties were reassigned to Orr in April 2017, but Cox had decided as early as February 2017 that he'd give Orr the MIM risk stream. *See* Doc. 32.11 at 14:5-15, 7:22-25, 12:1-25. Although Lukie didn't identify exact dates of her complaints to Cox, the

evidence establishes that her complaints to Cox were ongoing while she reported to him.

For example, while Lukie worked for Cox, she was responsible for compiling information from other direct reports for Cox's annual goals and objectives, cutting and pasting and spellchecking the document, and she *complained* to Cox about these administrative tasks. Doc. 32.8 at 126, 130:23-132:6, 128:23-129:6, 129:14-23. Further, in June 2016, Lukie attempted to resign because she was frustrated that she was still being asked to do administrative work, but Cox and Cassandra asked her to stay. Doc. 32.8 at 297:23-298:24, 304:15-308:2. Her administrative work for DeKeizer occurred during 2016 and 2017, and she opposed this practice to Cox, telling him "it was time-consuming, administrative and that it wasn't my responsibility to support Dan." Doc. 32.8 at 61:17-25, 65:6-18. Additionally, Cox was having her help Chatterji in an administrative capacity as late as 2016's fourth quarter. Doc. 32.8 at 377:2-380:14.

Lukie's affidavit also provides, specifically, that she complained to Cox of disparate treatment, harassment, and hostile work environment. Doc. 32.14 at ¶ 19. But courts must credit a nonmovant's evidence "even if, as is often the case, the plaintiff's evidence consists primarily or solely

of her own self-serving sworn statements or testimony." *Patterson*, 38 F.4th at 1351.

### 2. Lukie's complaints were not wholly unrelated to Cox's removal of her MIM duties

The amount of time between a complaint and an adverse action is merely "one factor that may tend to prove or disprove a causal link in a retaliation case." *Thomas v. Ala. Home Const.*, 271 Fed. App'x. 865, 868 (11th Cir. 2008). *Thomas* held there was "sufficient temporal proximity" between a plaintiff's *ongoing* complaints to her employer and her termination to establish retaliation. *Id.* In *Donnellon v. Fruehauf Corp.*, this Court held a one-month time period between a complaint and an adverse employment action "belies any assertion by the defendant that the plaintiff failed to prove causation." 794 F.2d 598, 601 (11th Cir. 1986); *accord Tebo v. City of DeBary, Fla.,* 784 Fed. App'x 727, 731 (11th Cir. 2019) (a termination 32 days after receiving an informal complaint was sufficient to satisfy the causation element).

Here, Lukie's deposition and affidavit establish *ongoing* complaints regarding her being unfairly assigned administrative duties, including through 2016 and 2017. Moreover, viewing the evidence in Lukie's most favorable light, a reasonable jury could infer that at least one complaint

occurred within one month of Cox's *decision* to remove her MIM duties (as early as February 2017) considering Lukie's testimony that she complained to Cox about the administrative tasks she had to do for DeKeizer and she performed those tasks in 2016 and 2017. *See* Doc. 32.8 at 61:17-25, 65:6-18.

Even if her complaints hadn't closely preceded Cox's decision to remove her MIM duties, temporal proximity isn't the only way to establish causation. *See Hughes v. Wal-Mart Stores E., LP*, 846 Fed. App'x 854, 858 (11th Cir. 2021). For example, in *Stewart v. DaimlerChrysler Fin. Servs. Am. LLC*, 2008 WL 11333128, *7 (S.D. Fla. Dec. 19, 2008), the court was "not persuaded by Defendant's argument indicating the eighteen-month time lapse between Plaintiff's March 2004 complaint and his termination in August [2005] precludes a finding of causation" where the plaintiff did not exclusively rely on temporal proximity but produced other circumstantial evidence to establish causation.

Here, Lukie has additional circumstantial evidence that her complaints of discrimination were the real cause of her MIM duties' removal, including her "exceeds expectations" work evaluation at the end of 2016 in contrast to Orr's "meets expectations" evaluation in 2016 before

transferring MIM to him. Docs. 31.5 at 21; 32.11 at 23:18-20. Also, Cox had agreed to Lukie's transfer to Tampa and the inevitable long-distance oversight of Liu before she began reporting to him and, consequently, before she complained to him about being asked to serve in a secretarial capacity. Doc. 31.5 at 21. Finally, Lukie's evidence that MetLife's proffered reasons for taking MIM from her are pretextual, *see infra* Argument II.B, lend additional circumstantial evidence.

## B.  A reasonable jury could find MetLife's proffered reasons for stripping the MIM duties were mere pretext

The district court ruled that MetLife advanced two legitimate, non-retaliatory reasons for giving Lukie's MIM duties to Orr: (1) New Jersey personnel would benefit from onsite leadership; and (2) MIM work would benefit from Cox's quantitative background. *See* Doc. 40 at 15. It further ruled that Lukie's assertion that Orr didn't have the requisite experience to take over MIM "amounts to quarreling with the wisdom of Cox's decision." Doc. 40 at 15. But that ruling weighed the evidence and ignored that Orr's lack of MIM experience suggests, along with other evidence, that the decision to transfer MIM to him was retaliatory.

To rebut the defendant's proffered reasons for the employment decision and establish that they're really just a coverup for retaliation, a

plaintiff can show "weaknesses, implausibilities, inconsistencies, inco-herencies, or contradictions in the employer's proffered legitimate rea-sons." *Rioux v. City of Atlanta, Ga.,* 520 F.3d 1269, 1275 (11th Cir. 2008); *Patterson*, 38 F.4th at 1352. Here, there's ample evidence from which a reasonable juror could find MetLife's proffered reasons for pulling MIM from Lukie were weak, implausible, and inconsistent.

MetLife asserts Cox wanted someone local to oversee Liu, but Lukie had requested her transfer, and Cox approved it back in March 2016, with full knowledge that she would be supervising Liu from afar, and expressed no contemporaneous concern for the distance. Doc. 32.8 at 233:5-16. Lukie then transferred in September 2016, and, thus, had been running MIM from Tampa for over seven months when Cox took it from her in April 2017 (and for over five months when Orr says Cox offered to give him MIM if he returned). *Id.* at 218:13-17.

If Lukie wasn't able to properly supervise Liu from afar, a reasona-ble juror could question why Cox gave her an "exceeds expectations" for the 2016 year and then wrote "[t]hanks for a productive year in 2016" on March 3, 2017. Docs. 31.5 at 21; 31.35; *see also Patterson*, 38 F.4th at 1354 (plaintiff's positive work performance reviews contributed to the

creation of a genuine issue of material fact on pretext). That would comport with Liu's belief that he and Lukie were doing well with MIM just before it was pulled from her. Indeed, his deposition was the first time Liu heard his performance needed any improvement. Doc. 32.12 at 16:25-17:6, 23:4-7, 14:15-4. Lukie testified there were MIM employees to be supervised in the Tampa office, MIM was her area of expertise, and Orr admitted he had no prior MIM experience. Doc. 32.8 at 176:13-177:25, 219:18-220:8, 332:20-22.

Additionally, although Cox claimed MIM risk management improved after he transferred it to Orr, Liu testified he actually had less assistance under Orr and that Orr's attention to MIM risk was "lacking" because he was "juggling two priorities." Doc. 32.12 at 16:25-17:6; 23:4-7; 18:20-19:8. "[T]aking all of the circumstances together," a reasonable juror could easily find MetLife's purported reason of wanting a MIM professional to be physically located in New Jersey was mere pretext. *Jefferson*, 891 F.3d at 925 (reasonable jury could find employer's explanation was pretextual and that employee's complaint was but-for cause of adverse employment action).

MetLife's second proffered reason was that Cox wanted a "new, broader quantitative approach to assessing MIM risk," presumably referring to Orr's background as an actuary. Doc. 31 at 25. But Orr testified that the MIM function was quickly given to someone else in 2018, shortly after he inherited it. Doc. 32.11 at 16:12-20. Further, Orr's quantitative background wasn't a contemporaneous reason given by Cox for his decision, but only later advanced after litigation ensued. *See* Doc. 31.47 (noting just that he "moved MIM risk so that I'd have a senior leader local in Whippany to manage Ray and to interact in person with the Investments staff there").

Finally, the evidence shows Cox was, in reality, just giving Orr his old quantitative job back (which included modeling the assets of the company, developing investment strategies to manage the assets, and managing market risk and derivatives risk under the investment umbrella) and, *in addition*, giving him Lukie's MIM duties. Docs. 32.11 at 14:5-15, 7:22-25, 12:1-25; 31.46 (announcement explaining Orr's oversight of MIM risk was *in addition* to developing and implementing tools for derivatives for market risk and derivatives oversight).

In short, Lukie has met MetLife's proffered reasons "head on" and rebutted them. *See Patterson*, 38 F.4th at 1353 (employer's proffered reason of firing based on poor performance for missing deadline was "implausible" where plaintiff testified her assignment had no deadline and employer didn't mention anything about her "late" assignment).

Additional evidence suggests that discrimination was the real reason Lukie's MIM duties were taken away, including the history of sexist comments at MetLife, the constant administrative duties required of Lukie, Lukie's disparate pay, Lukie's history of excellent work evaluations, and Cox's shocking failure to give Lukie any reason when he abruptly told her he was stripping her MIM responsibilities. *See Patterson*, 38 F.4th at 1353 (evidence that plaintiff was given no reason why she was fired contributed to genuine dispute of material fact on pretext). Thus, Lukie has presented sufficient evidence for a jury to find that MetLife's proffered reasons were false, and discrimination was real reason for removing her MIM duties. *Id.* at 1352.

The district court improperly weighed the pretext evidence when it called Lukie's citation to Orr's lack of MIM background "quarreling" and improperly credited MetLife's evidence over Lukie's. *See Jameson v.*

*Arrow Co.,* 75 F.3d 1528, 1533 (11th Cir. 1996) (district court improperly credited employer's version of events at summary judgment that employee failed to show that employer's proffered reasons for not hiring her in a specific position were pretextual). Summary judgment was improper.

## C.    A reasonable jury could find Lukie was constructively discharged

A plaintiff alleging a constructive discharge "must demonstrate that working conditions were 'so intolerable that a reasonable person in her position would have been compelled to resign.'" *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997). *Poole* held sufficient evidence of constructive discharge defeated summary judgment on a plaintiff's age discrimination claim because the 56-year-old plaintiff's work duties were reduced to almost nothing, and her boss had made comments to her such as "you're as old as my mother." *Id.* at 551-52.

Here, Lukie received comments such as "be the scribe" and men are more "technical," she was continually expected to perform secretarial duties even though she was a VP with an MBA and CPA, and, ultimately, her MIM area, which she had built from the ground up, was stripped from her and reassigned to a male with no MIM experience. Shortly thereafter, that male became an SVP while Lukie was left to babysit an individual

with no credentials. Viewing this evidence in Lukie's most favorable light, a reasonable jury could find a reasonable female executive in her position would find these conditions intolerable and resign. Accordingly, summary judgment on the issue of whether the discrimination, culminating in the removal of Lukie's MIM duties, constituted a constructive discharge was also improper.

### D.  At minimum, Lukie established a convincing mosaic of retaliation

A reasonable jury could find Lukie's retaliation evidence at least demonstrated a convincing mosaic of discrimination. *See supra* Argument I.D. Cox demanded she perform secretarial tasks for men to whom she didn't report. When she complained, he gave her MIM duties to a male with lower ratings and no MIM experience who had left the company and gave Lukie barely any notice or explanation.

## <u>CONCLUSION</u>

The Court should reverse the entry of summary judgment on counts one and three, vacate the judgment, and remand for further proceedings.

Respectfully submitted,

/s/ Thomas Burns

| | |
|---|---|
| Kathryn C. Hopkinson | Thomas A. Burns |
| CURRAN ANTONELLI LLP. | Shannon C. Reese |
| 400 North Tampa Street, 15th floor | BURNS, P.A. |
| Tampa, FL 33602 | 301 West Platt Street, Suite 137 |
| (508) 274-9169 | Tampa, FL 33606 |
| khopkinson@curranantonelli.com | (813) 642-6350 |
| | tburns@burnslawpa.com |
| *Trial counsel for MaryBeth Lukie* | sreese@burnslawpa.com |
| | *Appellate counsel for MaryBeth Lukie* |

## **CERTIFICATE OF COMPLIANCE**

1.      This brief complies with Federal Rule of Appellate Procedure 32(a)(7)(B)'s type-volume requirement. As determined by Microsoft Word 2010's word-count function, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and 11th Circuit Rule 32-4, this brief contains 12,819 words.

2.      This brief further complies with Federal Rule of Appellate Procedure 32(a)(5)'s typeface requirements and with Federal Rule of Appellate Procedure 32(a)(6)'s type-style requirements. Its text has been prepared in a proportionally spaced serif typeface in roman style using Microsoft Word 2010's 14-point Century Schoolbook font.

August 25, 2022                         /s/ Thomas Burns
                                        Thomas A. Burns

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I filed the original and three copies of the foregoing brief with the Clerk of Court via CM/ECF and regular mail on this 25th day of August, 2022, to:

> David J. Smith, Clerk of Court
> U.S. COURT OF APPEALS FOR THE
>    ELEVENTH CIRCUIT
> 56 Forsyth Street N.W.
> Atlanta, GA 30303

I FURTHER CERTIFY that I served a true and correct copy of the foregoing brief via CM/ECF on this 25th day of August, 2022, to:

> **MetLife Group, Inc.**
> Christopher A. Parlo
> Joseph Magrisso

August 25, 2022                    /s/ Thomas Burns_____
                                   Thomas A. Burns