No. 22-10967

---

## In the United States Court of Appeals

### FOR THE ELEVENTH CIRCUIT

---

MARYBETH LUKIE,

*Plaintiff - Appellant*,

versus

METLIFE GROUP, INC.,

*Defendant - Appellee*.

---

On Appeal from the U.S. District Court for the Middle District of Florida
No. 20-cv-943 (Honorable Thomas P. Barber)

---

## BRIEF OF APPELLEE

---

Joseph D. Magrisso
MORGAN, LEWIS & BOCKIUS LLP
600 Brickell Avenue, Suite 1600
Miami, FL 33131
T. (305) 415-3424

Christopher A. Parlo
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
T. (212) 309-6062

*Counsel for MetLife Group, Inc.*

No. 22-10967

*Marybeth Lukie v. MetLife Group, Inc.*

**CERTIFICATE OF INTERESTED PERSONS
& CORPORATE DISCLOSURE STATEMENT**

Defendant-Appellee MetLife Group, Inc. respectfully submits this Certificate of Interested Persons and Corporate Disclosure Statement, identifying the following trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case:

1.    Barber, Hon. Thomas P. (United States District Judge)

2.    Burns, P.A. (Counsel for Plaintiff-Appellant)

3.    Burns, Thomas A. (Counsel for Plaintiff-Appellant)

4.    Curran Antonelli LLP (Counsel for Plaintiff-Appellant)

5.    Field, Carol Ann (Former counsel for Defendant-Appellee)

6.    Greenberg Traurig, P.A. (Former counsel for Defendant-Appellee)

7.    Hale, Ashley J. (Counsel for Defendant-Appellee)

8.    Holden, West Allan (Former counsel for Defendant-Appellee)

9.    Hopkinson, Kathryn Comly (Counsel for Plaintiff-Appellant)

10.    Littler Mendelson, P.C. (Former counsel for Defendant-Appellee)

11.    Lukie, Marybeth (Plaintiff-Appellant)

12.    Magrisso, Joseph D. (Counsel for Defendant-Appellee)

13.    McCrea, Jr., Richard C. (Former counsel for Defendant-Appellee)

No. 22-10967

*Marybeth Lukie v. MetLife Group, Inc.*

14.    MetLife Group, Inc. (Defendant-Appellee)

15.    MetLife, Inc. (NYSE: MET) (Defendant-Appellee's parent company, which wholly owns Defendant-Appellee)

16.    Morgan, Lewis & Bockius LLP (Counsel for Defendant-Appellee)

17.    Parlo, Christopher A. (Counsel for Defendant-Appellee)

18.    Sansone, Hon. Amanda Arnold (United States Magistrate Judge)

19.    Thompson, James Moten (Counsel for Plaintiff-Appellant)

20.    Thompson Legal Center, LLC (Counsel for Plaintiff-Appellant)

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendant-Appellee MetLife Group, Inc. discloses that it is a wholly owned subsidiary of MetLife, Inc., a publicly traded company. No publicly held company owns more than 10% of MetLife, Inc.'s stock.

C-2 of 2

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellee MetLife Group, Inc. does not request oral argument.

# <u>TABLE OF CONTENTS</u>

**Page**

CERTIFICATE OF INTERESTED PERSONS & CORPORATE
DISCLOSURE STATEMENT ...................................................................C-1

CORPORATE DISCLOSURE STATEMENT ......................................C-2

STATEMENT REGARDING ORAL ARGUMENT ................................i

TABLE OF CITATIONS ........................................................................iv

PRELIMINARY STATEMENT ...............................................................1

STATEMENT OF THE ISSUES...............................................................3

STATEMENT OF THE CASE...................................................................4

    I.      FACTUAL BACKGROUND ...........................................4

          A.     Plaintiff's Employment With MetLife.....................4

          B.     Plaintiff's Alleged Comparators .............................15

          C.     Plaintiff's Claims ....................................................17

    II.     THE DISTRICT COURT'S RULING...........................17

SUMMARY OF THE ARGUMENT ......................................................20

ARGUMENT ..........................................................................................21

    I.      STANDARD OF REVIEW ............................................21

    II.     THE DISTRICT COURT CORRECTLY DETERMINED
          THAT NO REASONABLE TRIER OF FACT COULD FIND
          THAT PLAINTIFF WAS DISCRIMINATED AGAINST..............22

          A.     The District Court Correctly Determined That Plaintiff
               Failed To Establish She Was Paid Less Than Similarly
               Situated Male Employees. ......................................22

          B.     Plaintiff Failed To Adduce Evidence That She Was
               Assigned Tasks In A Discriminatory Manner. .......................26

    III.    THE DISTRICT COURT CORRECTLY DETERMINED
          THAT NO REASONABLE TRIER OF FACT COULD FIND
          THAT PLAINTIFF WAS RETALIATED AGAINST.....................31

# TABLE OF CONTENTS

(continued)

**Page**

    A.    Plaintiff Failed To Establish Even A *Prima Facie* Case Of Retaliation. ..............................................................31

    B.    Plaintiff Has No Evidence Of Any Causal Link Between Any Purported "Protected Activity" And The Complained-Of Actions. ...........................................34

        1.    Plaintiff Cannot Prove Temporal Proximity By A Preponderance Of The Evidence. ...................................35

        2.    Plaintiff Has No Supportable Argument That MetLife's Reasons Were Pretextual. .............................37

IV.    THE DISTRICT COURT CORRECTLY DETERMINED THAT NO REASONABLE TRIER OF FACT COULD FIND THAT PLAINTIFF WAS CONSTRUCTIVELY DISCHARGED. ..................................................................42

CONCLUSION ...........................................................................46

CERTIFICATE OF COMPLIANCE .............................................47

## <u>TABLE OF CITATIONS</u>

**Page(s)**

C<small>ASES</small>

*A.L. by & through D.L. v. Walt Disney Parks & Resorts US, Inc.*,
    900 F.3d 1270 (11th Cir. 2018) ..........................................................21

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 248 (1986).............................................................................21

*Avila v. Childers*,
    212 F. Supp. 3d 1182 (N.D. Fla. 2016) ..............................................35

*Baker v. Cont'l Aerospace Techs., Inc.*,
    No. 21-cv-00004, 2021 WL 6050437 (S.D. Ala. June 9, 2021).........30

*Brown v. Ala. Dep't of Transp.*,
    597 F.3d 1160 (11th Cir. 2010) ..........................................................35

*Burlington N. & Santa Fe Ry. Co. v. White*,
    548 U.S. 53 (2006)........................................................................27, 28

*Calicchio v. Oasis Outsourcing Grp. Holdings, L.P.*,
    No. 21-12854, 2022 WL 2761720 (11th Cir. July 15, 2022) .......24, 25

*Carney v. City of Dothan*,
    158 F. Supp. 3d 1263 (M.D. Ala. 2016).............................................27

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).............................................................................21

*Chapman v. AI Transp.*,
    229 F.3d 1012 (11th Cir. 2000) ..........................................................39

*Chappell v. Chao*,
    388 F.3d 1373 (11th Cir. 2004) .............................................21, 26, 31

*Cooper v. S. Co.*,
    390 F.3d 695 (11th Cir. 2004) ......................................................29, 30

## TABLE OF CITATIONS
(continued)

**Page(s)**

*Cox v. Am. Cast Iron Pipe Co.*,
    784 F.2d 1546 (11th Cir. 1986) ...........................................................26, 28, 44

*Earle v. Birmingham Bd. of Educ.*,
    843 F. App'x 164 (11th Cir. 2021) ....................................................................24

*Eliassaint v. RTG Furniture Corp.*,
    551 F. Supp. 3d 1293 (M.D. Fla. 2021)............................................................25

*Elrod v. Sears, Roebuck & Co.*,
    939 F.2d 1466 (11th Cir. 1991) ........................................................................42

*Faulk v. Volunteers of Am.*,
    444 F. App'x 316 (11th Cir. 2011) ....................................................................22

*Freese v. Wuesthoff Health Sys., Inc.*,
    No. 06-CV-175, 2006 WL 1382111 (M.D. Fla. May 19, 2006) .......................32

*Gogel v. Kia Motors Mfg. of Ga., Inc.*,
    967 F.3d 1121 (11th Cir. 2020) ............................................................21, 41, 42

*Gray v. City of Jacksonville*,
    492 F. App'x 1 (11th Cir. 2012) ........................................................................23

*Greene v. Loewenstein, Inc.*,
    99 F. Supp. 2d 1373 (S.D. Fla. 2000)................................................................33

*Heatherly v. Univ. of Ala. Bd. of Tr.*,
    778 F. App'x 690 (11th Cir. 2019)....................................................................24

*Jackson v. Hall Cnty. Gov't*,
    518 F. App'x 771 (11th Cir. 2013)....................................................................27

*Jones v. Unity Behavioral Health, LLC*,
    No. 20-14265, 2021 WL 5495578 (11th Cir. Nov. 23, 2021)...........................30

*Joyner v. Town of Elberta*,
    22 F. Supp. 3d 1201 (S.D. Ala. 2014) ...............................................................25

# TABLE OF CITATIONS
(continued)

Page(s)

*Lawrence v. Wal-Mart Stores, Inc.*,
  236 F. Supp. 2d 1314 (M.D. Fla. 2002)................................................45

*Lewis v. City of Union City*,
  918 F.3d 1213 (11th Cir. 2019) ..........................................................24

*Lucas v. W.W. Grainger, Inc.*,
  257 F.3d 1249 (11th Cir. 2001) .....................................................21, 22

*MacLean v. City of St. Petersburg*,
  194 F. Supp. 2d 1290 (M.D. Fla. 2002)................................................34

*Manley v. DeKalb County*,
  587 F. App'x 507 (11th Cir. 2014).......................................................32

*McCall v. Bright House Networks, LLC*,
  No. 18-cv-1670, 2020 WL 70974 (M.D. Fla. Jan. 7, 2020) ...............40

*McCone v. Pitney Bowes, Inc.*,
  582 F. App'x 798 (11th Cir. 2014).......................................................27

*Minnifield v. City of Birmingham Dep't of Police*,
  791 F. App'x 86 (11th Cir. 2019) ..................................................33, 36

*Miranda v. B & B Cash Grocery Store, Inc.*,
  975 F.2d 1518 (11th Cir. 1992) .....................................................24, 25

*Ostrow v. GlobeCast Am. Inc.*,
  489 F. App'x 433 (11th Cir. 2012)..................................................40, 42

*Palm Beach Cnty. Sch. Bd. v. Wright*,
  217 So. 3d 163 (Fla. Dist. Ct. App. 2017)...........................................37

*Pate v. Chilton Cnty. Bd. of Educ.*,
  853 F. Supp. 2d 1117 (M.D. Ala. 2012)..............................................41

*Peters v. HealthSouth of Dothan, Inc.*,
  542 F. App'x 782 (11th Cir. 2013).......................................................31

vi

## TABLE OF CITATIONS
(continued)

**Page(s)**

*Secs. & Exch. Comm'n v. Chenery Corp.*,
    318 U.S. 80 (1943)....................................................................21

*Siff v. Audiology Distrib., LLC*,
    No. 19-61606, 2020 WL 6268208 (S.D. Fla. Oct. 19, 2020) .............................29

*Smith v. Fletcher*,
    559 F.2d 1014 (5th Cir. 1977) ...........................................................28

*Stover v. Ocala Auto. Mgmt., LLC*,
    No: 5:15-cv-538, 2016 WL 8711719 (M.D. Fla. Sept. 9, 2016) .......................33

*Sutherland v. Boehringer-Ingelheim Pharms., Inc.*,
    700 F. App'x 955 (11th Cir. 2017) .....................................................26

*Van Der Meulen v. Brinker Int'l*,
    153 F. App'x 649 (11th Cir. 2005) ....................................................45

*Van T. Junkins & Assocs. v. U.S. Indus., Inc.*,
    736 F.2d 656 (11th Cir. 1984) ......................................................22, 33

*Vira v. Crowley Liner Servs., Inc.*,
    723 F. App'x 888 (11th Cir. 2018) ....................................................38

*Walsh v. City of Ocala*,
    No. 18-0402, 2019 WL 4395297 (M.D. Fla. June 17, 2019) ...........................43

*Zarza v. Tallahassee Hous. Auth.*,
    686 F. App'x 747 (11th Cir. 2017) ....................................................43

**STATUTES**

Civil Rights Act of 1964, Title VII..............................................24, 25, 27

Equal Pay Act.................................................................24, 25

F.S.A. § 760.11(1).........................................................16, 23, 26

Florida Civil Rights Act.....................................................1, 17, 18, 24

## PRELIMINARY STATEMENT

Defendant-Appellee MetLife Group, Inc. ("MetLife" or "Defendant") submits this brief in opposition to the appeal filed by Plaintiff Marybeth Lukie ("Ms. Lukie" or "Plaintiff"). In her brief ("Plaintiff's Brief" or "Br."), Plaintiff asks this Court to vacate the well-reasoned and legally sound decision of the District Court, which granted Defendant's motion for summary judgment on Plaintiff's claims of discrimination and retaliation under the Florida Civil Rights Act ("FCRA").[1] Plaintiff seeks to convince this Court that the District Court misapprehended or ignored the record (it did not), and that, instead of the result compelled by the record, a jury could reach the conclusion that Plaintiff was intentionally retaliated or discriminated against (in the absence of any record evidence to support such a conclusion). But the District Court correctly recognized that no reasonable factfinder could conclude that Plaintiff was discriminated or retaliated against, and appropriately granted summary judgment to Defendant on those grounds. No valid basis for reversal exists.

---

[1] Although Plaintiff's Notice of Appeal purports to appeal from the District Court's order on summary judgment as well as "all other orders in this case," Doc 43 - Pg 1120, Plaintiff does not address any other order in her brief, let alone explain why orders granting extensions of deadlines, setting discovery or pretrial schedules, or permitting the appearance of counsel *pro hac vice* would be properly appealed.

Specifically, Plaintiff's claims of discrimination based on being assigned so-called "administrative" tasks fail because: (1) the undisputed record does not demonstrate that Plaintiff actually received such assignments more frequently than any other colleague; (2) the receipt of such assignments (which in any event were not "administrative") is not an "adverse action"; and (3) Plaintiff adduced no evidence that her receipt of those assignments was because of her gender, rather than for legitimate, non-discriminatory business reasons. As to her claim she was paid less than her male peers, Plaintiff identified no true comparator during discovery, nor has she adduced evidence that any difference in pay was because of her gender.

Finally, Plaintiff's retaliation claim fails at the *prima facie* stage because she did not engage in any protected activity, nor did she experience any adverse action. Specifically, she cannot show that she was constructively discharged, especially given the high bar for such claims. In any event, the District Court correctly concluded that Plaintiff has established neither temporal proximity nor other facts from which a reasonable jury could infer a causal connection between the actions of which she complains and any purported protected activity.

For these reasons, as detailed below, this Court should affirm the District Court's decision dismissing all of Plaintiff's claims.

## STATEMENT OF THE ISSUES

1.      Whether the District Court correctly held that Plaintiff failed to adduce evidence that the assignment of "administrative" work was an adverse action;

2.      Whether the District Court correctly held that Plaintiff had not established any true male comparator that was paid more than her;

3.      Whether Plaintiff failed to satisfy her prima facie case of retaliation by failing to produce evidence that she engaged in any protected activity and/or that she experienced an adverse employment action; and

4.      Whether the District Court correctly held that Plaintiff failed to produce evidence from which a reasonable factfinder could conclude that she was retaliated against because of any purported protected activity.

## STATEMENT OF THE CASE

## I.     FACTUAL BACKGROUND

### A.     Plaintiff's Employment With MetLife.

Ms. Lukie was hired by MetLife in December 2007 as an Assistant Vice President, Investments in MetLife's Morristown, New Jersey office. Doc 31-2 - Pg 243. In 2011, she received a promotion to Vice President and transferred to MetLife's Enterprise Risk Management group ("Risk"), reporting to Lori Evangel. In November 2012, Frank Cassandra replaced Ms. Evangel and became Ms. Lukie's supervisor. Doc 31-2 - Pg 252. In April 2016, Graham Cox replaced Mr. Cassandra and was Ms. Lukie's supervisor until Ms. Lukie voluntarily resigned in May 2017. Doc 31-2 - Pg 256; Doc 31-3 - Pg 274; Doc 31-4 - Pg 301.

Ms. Lukie was a valuable and respected member of the Risk organization. Mr. Cassandra and Mr. Cox consistently gave her high ratings on her annual performance evaluations (2012: Leading Contributor; 2013: Outstanding; 2014: Good; 2015: Good; 2016: Exceeds Expectations). Doc 31-5 - Pgs 335, 338, 345, 347, 351; Doc 31-3 - Pg 275. She was well regarded by her peers, most direct reports, and, critically, senior management and executives at MetLife. In fact, because she was so well regarded, and viewed as such an integral member of the Risk organization, she was invited to and a regular part of meetings attended by only the most senior members of MetLife. Doc 31-7 - Pg 382. As Ms. Lukie admitted at

her deposition, she was nearly always the most junior employee at these critically important meetings.

However, while she was enjoying a successful career at MetLife, Ms. Lukie was unfortunately going through a very difficult period in her personal life. In October 2015, Ms. Lukie contacted Mr. Cassandra to let him know that she had been physically assaulted by her boyfriend, and that, in the course of the assault, her boyfriend had taken her company-issued cellphone. Doc 31-6 - Pg 364; Doc 31-7 - Pg 423. The police had to be involved, she went to the hospital, suffered a bruised spine, tail bone, neck and other injuries, and had to miss several days of work. Doc 31-8 - Pg 543; Doc 31-7 - Pgs 423-24. Mr. Cassandra immediately contacted Corporate Security to ensure steps were taken to protect Ms. Lukie at work, such as providing her a closer parking spot and providing an escort to and from the building each day. Doc 31-9 - Pg 545; Doc 31-10 - Pg 547. Mr. Cassandra also contacted Employee Relations so they could assist Ms. Lukie with whatever she needed. Doc 31-11 - Pg 549. Mr. Cassandra also made sure to provide Ms. Lukie with contact information for Work-Life Assist Services, "just in case you feel like reaching out to someone other than family, friends and co-workers." Doc 31-12 - Pg 551. In short, MetLife assisted Ms. Lukie in every way it could in response to, and in the aftermath of, this traumatic personal event.

5

In March 2016, a few months after the then latest domestic violence incident, Ms. Lukie indicated that she wanted to move from New Jersey to Tampa, Florida. Doc 31-13 - Pg 553; Doc 31-7 - Pgs 421-22, 424.  Mr. Cassandra and Mr. Cox assumed Ms. Lukie wanted to move to live as far away as possible from her boyfriend, who had abused her on several prior occasions.  Apparently, however, that was not the reason.  To the contrary, in June 2016, just a few months after first requesting to move to Tampa, and while she was still working for MetLife full-time as a Vice President, Ms. Lukie and her boyfriend purchased a franchise business – Mosquito Squad, to kill mosquitos and other pests.  Doc 31-14 - Pg 555; Doc 31-15 - Pg 559; Doc 31-7 - Pgs 422-23.  Ms. Lukie never advised MetLife that she was starting, and then helping to run, another business at the same time she was working for MetLife.[2]  Doc 31-7 - Pg 422-23.

In any event, since MetLife also had operations in Florida, Ms. Lukie could seek to transfer there.  As Mr. Cassandra would soon be moving into a new role, and Ms. Lukie would be reporting to Mr. Cox, she asked Mr. Cassandra to speak to Mr. Cox about the possibility of her transferring to MetLife's Tampa office, despite most of her direct reports remaining in New Jersey.  After Mr. Cassandra spoke to Mr.

---

[2] Discovery showed that, as early as June 7, 2016, Ms. Lukie was meeting with Mosquito Squad representatives to start her new business.

6

Cox, Ms. Lukie herself spoke to Mr. Cox about the move, and he quickly approved the transfer on or around March 29, 2016.  Doc 31-7 - Pg 424.

Although Mr. Cox approved the transfer, on June 21, 2016, Ms. Lukie abruptly emailed Mr. Cox, Mr. Cassandra, and Stan Talbi, the Company's Chief Risk Officer, and said "**I need to resign effective today[.] I will return my equipment to security**."  Doc 31-16 - Pg 561.  Ms. Lukie had not previously raised any complaint or concern with any of those individuals or about any issue at work, and they were at a loss as to why Ms. Lukie was seeking to leave.  Doc 31-3 - Pgs 275, 283-84; Doc 31-4 - Pg 321; Doc 31-16 - Pg 561.  Mr. Cox immediately called Ms. Lukie.  Within *25 minutes* of Ms. Lukie sending her resignation email, **Mr. Cox had convinced her not to quit her job**.[3]  Doc 31-16 - Pg 561.  As Mr. Cox later explained to Mr. Cassandra and Mr. Talbi, "[t]he move, selling her house, etc. has been hard on her.  We talked through it, and that helped.  I've also agreed to let her work from Tampa sooner, to accommodate her timing (she never mentioned before, and I didn't realize, that the timing [of her move] was causing her stress)."[4]  *Id.*

---

[3] As Plaintiff testified at her deposition, she had also attempted to resign at least one time before this, and MetLife again persuaded her to stay.

[4]Among the other pressures she was facing, the sale of Ms. Lukie's house had fallen through at the last minute.  As a result, she was about to go to Florida, but she would still have a house in New Jersey and nowhere to live in Florida.

By September 1, 2016, Ms. Lukie had sold her house in New Jersey, moved to Tampa with her boyfriend, acquired a Mosquito Squad franchise, and started working in MetLife's Tampa office.  Doc 31-2 - Pg 255.  However, within just a few months Ms. Lukie and her boyfriend were again having relationship issues.  The boyfriend moved out of Ms. Lukie's house and she demanded that he not return to the house, even to get his personal belongings, without a sheriff being present.  Doc 31-17 - Pg 563.  At the same time, her close friend demanded that Ms. Lukie call or email from her MetLife phone/email address every day (not her personal phone, to which the boyfriend could have access), to let her know that she was safe, because Ms. Lukie's boyfriend is "unpredictable because it's [*sic*] a sociopath."  Doc 31-18 - Pg 565.[5]  She insisted Ms. Lukie notify MetLife security about the danger he posed and obtain a restraining order.  Doc 31-19 - Pg 567.

With her personal issues still dominating her life in the background, Ms. Lukie continued to work from the Tampa office, returning rarely to New Jersey for business.  In January 2017, she missed a phone meeting with Mr. Cox.  Doc 31-4 - Pg 302; Doc 31-7 - Pg 437.  Because it was so unusual, Mr. Cox contemporaneously documented what happened in a note:

> MaryBeth Lukie missed a one on one meeting with me at 1 pm. She did not dial into the call as expected, and did not immediately answer emails.  I reached out to members

---

[5] Ms. Lukie and her friend referred to Ms. Lukie's boyfriend as "it."

of her team looking for her.  One team member told me that he had gone for drinks the night before with MaryBeth, and that she had had too much to drink.  He had been in touch with her earlier in the day but she had not felt well enough to come to work, despite having traveled here to NJ from her home in Tampa on business.

I reached MaryBeth on her mobile this afternoon.  I asked why she missed the call and did not come to work today, and she told me that she had gone out for drinks last night and that she had "too much fun last night" and was not feeling well enough to work today.  She immediately admitted that she had had too much to drink yesterday and was very apologetic.

**I very clearly expressed that I was concerned about her well-being.**  I also very clearly state[d] that it was not acceptable to allow drinking to adversely impact her work performance, such as by missing meetings and not being able to come to work.  She said she understood that.  During our call, however, MaryBeth did not sound like her normal self.  She was slurring words and using expressions that gave me the impression she was inebriated today as well.

Doc 31-20 - Pg 569 (emphasis added).

A few days later, Mr. Cox again noticed on a call with Ms. Lukie that she "**did not seem to be her normal focused self**.  Her tone of voice was unusual, and she sounded inebriated.  There was at least one instance where she asked a question on a topic we had just covered.  **I was concerned after hearing her on the call.  After the call I reached out to her, calling her cell phone and leaving a message.**  I also sent her an email to call me, but she didn't call until after I had left for the day." Doc 31-21 - Pg 571 (emphasis added); Doc 31-4 - Pgs 302-03.

9

The very next day, Mr. Cox received a strange call from Ms. Lukie's boyfriend (the same one involved in the October domestic violence incident), saying that he was taking her to the hospital, but would not provide any additional information.  Doc 31-22 - Pg 574.  Given the prior physical abuse that Ms. Lukie received from this individual, Mr. Cox was naturally worried about her.  Doc 31-22 - Pg 575.  He immediately tried to find her to make sure she was ok, including emailing her to say, "I'm worried about you, please contact me."  Doc 31-22 - Pg 575.  Ms. Lukie eventually responded that she was at the hospital and believed she had Parkinson's disease.  Doc 31-22 - Pg 573.

On February 9, 2017, two days later, Ms. Lukie said that she needed to take time off, writing, "I need to take some time off for personal reasons."  Doc 31-23 - Pg 577.  However, when Mr. Cox reached out to her for specifics, **he could not get in touch with her**, and noted that, "**I am increasingly concerned.  I haven't actually spoken to her live since Monday."**  Doc 31-24 - Pg 579 (emphasis added).  Ms. Lukie did not email Mr. Cox back until the next day, and then she did so, only to **resign again**, saying, "**[f]or personal reasons, I will not be back**."  Doc 31-25 - Pg 581 (emphasis added).  Mr. Cox immediately sent the resignation email to Mr. Cassandra, who said, "Why would she quit if she has health issues?  Something just doesn't seem right at all."  Doc 31-26 - Pg 583.

10

Ms. Lukie then disappeared again. Mr. Cox and Mr. Cassandra worked with human resources, employee relations, and the local police department to make sure that Ms. Lukie was safe. They did not stop trying to locate Ms. Lukie until they heard, days later, that a "Deputy [police officer] did make contact with MaryBeth." Doc 31-27 - Pg 585; Doc 31-28 - Pg 587; Doc 31-29 - Pg 589; Doc 31-30 - Pg 591. **Mr. Cox and Mr. Cassandra both spoke with Ms. Lukie that weekend and convinced her *again* not to quit**. Doc 31-31 - Pg 593; Doc 31-32 - Pg 595. Mr. Cassandra offered her words of encouragement, "We're going to help you get through all of this. Hang tough. We'll touch base tomorrow." Doc 31-31 - Pg 593. After speaking with her, Mr. Cox reached out to human resources, on a Sunday morning, to let them know that Ms. Lukie believed she had been diagnosed with Parkinson's, and to find out "**what is the right process, and what do I need to do to motivate the appropriate support for MaryBeth?  Ideally I'd like someone to contact her on Monday morning and get the wheels in motion.  She clearly needs help and I'd like to make sure that we provide it.**" Doc 31-32 - Pg 595 (emphasis added). Within just four days, Ms. Lukie was approved for short term disability and she began that leave immediately. Doc 31-33 - Pg 597.

While she was out on short term disability leave, from February 7 through March 21, Mr. Cox worked with the compensation team to make sure Ms. Lukie received her compensation increase and bonus. Doc 31-34 - Pgs 599-600. On March

3, 2017, Ms. Lukie received an "Exceeds Expectations" performance rating, and Mr. Cox emailed her to say, "Thanks for a productive year in 2016." Doc 31-35 - Pg 602. Mr. Cox also let her know that, "you'll note that the company performance factor for [an incentive bonus] was 85%, so you should view your payout rate relative to that level. Since you are getting *more than the 85%*, that reflects well on your personal performance . . . . The salary increase shown here is not effective until you return to work . . . . It was great talking to you this morning. You sounded better, which is great." *Id.*

On March 17, 2017, a few days before Ms. Lukie was scheduled to return from short term disability, her boyfriend was arrested again for a domestic violence incident. Doc 31-36 - Pgs 605-22. The police report of the incident noted how drunk Ms. Lukie appeared to be. Doc 31-36 - Pg 612. Ms. Lukie explained the situation to her co-worker Jon Yoser, who then informed the Company. Doc 31-37 - Pg 624.

Ms. Lukie was scheduled to return to work on March 22, 2017, but she suffered an anxiety attack and was unable to make it into work. Doc 31-38 - Pg 626. Mr. Cox let her work from home until she was ready to come to work. *Id.* A few days later, she explained to a friend at work that she had called the Sheriff about her boyfriend, was just waiting for the prosecutor to call her back, and that she had another anxiety attack. Doc 31-39 - Pg 628.

On March 23, Mr. Cox wrote to Human Resources, saying "can you please make sure MaryBeth gets her raise," which was scheduled to kick in once she resumed active status. Ms. Lukie received an $8,000 raise, increasing her base salary to $259,000. Doc 31-34 - Pg 599. Although there was another "incident" with her boyfriend on March 27, Ms. Lukie eventually returned to work on March 28, 2017. Doc 31-40 - Pg 630. The very next day, the Florida State Attorney issued a Notice of Termination of Prosecution against her boyfriend.[6]  Doc 31-41 - Pg 632.

In April 2017, Mr. Cox let Ms. Lukie know that one small aspect of her role would be changing. Doc 31-4 - Pgs 305-06, 314. One of Ms. Lukie's responsibilities was working on MetLife Investment Management Risk ("MIM Risk") with one of her direct reports, Ray Liu. Mr. Cox thought Mr. Liu would benefit from having hands-on help in New Jersey to improve his performance. Mr. Liu worked in New Jersey, not Florida. At the same time, Mr. Cox was trying to bring former MetLife employee Scott Orr back to MetLife's office in New Jersey. As part of their

---

[6] The next day, March 30, Ms. Lukie wrote to a friend, "blood pressure is back to its low level without my meds. It feels great . . . I call IT polock accordian loser kid with no friends that turned to abusing others because of its parents. I am lol. OMG I feel great. Now just need the prosecutor to call no mercy this time. Got my Toms River stuff [files of last domestic violence episode] from last October or November 23 pages from police and hospital . . . Can you say jail house rock." Doc 31-44 - Pg 695. On April 7, 2017 the same friend wrote to Ms. Lukie, "get your butt down to the police station today and file for a TRO – you're afraid for your life, aren't you? You've said so - I would be!" Doc 31-45 - Pg 697.

discussions about returning to MetLife, Mr. Orr indicated that he would like more responsibility.  Mr. Cox saw the perfect opportunity to give Mr. Orr more responsibility and to give Mr. Liu a supervisor **on site** with him in New Jersey.  Doc 31-43 - Pg 677; Doc 31-4 - Pg 308.  Mr. Cox also believed that since the bulk of the MIM Risk business leaders were in New Jersey, it made the most sense to have their liaison with his department be in New Jersey and not Florida.  Doc 31-4 - Pg 308.  Mr. Orr, who was tapped to play that role, was in New Jersey.  Doc 31-43 - Pgs 669-71.  Ms. Lukie, obviously, was not.  *See* Doc 31-4 - Pgs 304-05.

Simultaneously, Mr. Cox thought it made sense to give Ms. Lukie another direct report in Florida (Jai Maxwell).  Doc 31-4 - Pgs 305-06.  Since MIM Risk was, at most, only about 10-20% of Ms. Lukie's work, the change to her daily work would be minimal, at best, and replaced by the work of supervising Mr. Maxwell.  Mr. Cox informed Ms. Lukie of these changes on or before April 18, 2017, and informed the entire Corporate Risk Management organization on April 18, 2017.  Doc 31-4 - Pgs 305-06; Doc 31-46 - Pgs 699-702.  Ms. Lukie, who had helped form the MIM Risk function, was upset that it would be changing hands, even though it was only a very small part of her job duties.  Doc 31-7 - Pgs 426-29.

Three weeks later, on May 8, 2017, and without any notice or warning, **<u>Ms. Lukie resigned to Mr. Cox for the third time</u>**.  Doc 31-47 - Pg 704.  Mr. Cox, who had, twice before, personally convinced Ms. Lukie not to quit, finally accepted her

14

resignation.  *Id.*  While Ms. Lukie alleged that her role had been diminished due to

Mr. Orr taking over MIM Risk, Mr. Cox explained, clearly:

> I do want to emphasize, as I did yesterday, that neither
> myself nor Stan view moving Ray/MIM risk away from
> you and moving project management/Jai to you as
> diminishing your role.  Nor do we view your role as
> "administrative work."  Your role incorporated all of our
> operational risk management efforts, emerging risk
> management, management of major projects across risk,
> and over governance for our risk management framework,
> including major projects such as our Enterprise ORSA.  I
> moved MIM risk so that I'd have a senior leader local in
> Whippany to manage Ray and to interact in person with
> the Investments staff there.

*Id.*  Accordingly, May 9, 2017 was Ms. Lukie's last day of employment at MetLife.

She emailed a friend on July 14, saying, about her Mosquito Squad business, "I got

100 customers in the first month one adult community and 4 restaurants. . . . Some

franchises make over 2 million a year."  Doc 31-48 - Pg 706.  On August 1 she

emailed a friend, "[a]fter moving here I was diagnosed with degenerative disc

disease of my neck and anxiety to the point I could not leave my house.  **So I just**

**quit**."  Doc 31-49 - Pg 708 (emphasis added).

## B.    **Plaintiff's Alleged Comparators**

During her tenure at MetLife, Plaintiff worked at times with Jim Dingler, Scott

Orr, Howie Kurpit, and Rob Semke.   Ms. Lukie testified that each of those

individuals had "different areas of expertise."  Doc 31-7 - Pg 405.  As to Mr. Dingler,

Plaintiff testified that "what [she] did and what Mr. Dingler did were *different*"

because "he headed up the credit risk team" and *she did not even work in the credit risk group*. *Id*. (emphasis added). Moreover, Mr. Dingler worked in the Investments group, *not* the Risk Management group. *Id*. Mr. Dingler also left MetLife in 2013, well outside the one-year period in which Plaintiff could bring a claim. F.S.A. § 760.11(1).

As to Mr. Kurpit, he was a Senior Vice President whereas Ms. Lukie was only a Vice President. Doc 31-7 - Pg 465. Additionally, Mr. Kurpit did "risk for EMEA" and Plaintiff "wouldn't be doing that, that wasn't [her] job." Doc 31-7 - Pg 465.

As to Mr. Semke, Plaintiff admitted that he and she "had different jobs," and so *she did not know* what he was doing on a day-to-day basis. *Id*. In fact, Mr. Semke reported to a different manager, in a different group, and was the EMEA Risk Officer, a position Plaintiff never held. *Id.*

Finally, as to Mr. Orr, Plaintiff admitted that, because Mr. Orr was an actuary, he was on a different pay scale than her. She explained, "A: . . . [actuaries] were on a different pay scale than the corporate pay scale. So the actuaries were compensated differently than non-actuaries. Q: Actuaries were paid more, correct? A: **<u>Yes</u>**." Doc 31-7 - Pgs 375-76 (emphasis added). In addition to being an actuary, Mr. Orr is also a "quant" – and so he is able to oversee the risk analyses for Market Risk-Derivatives, something Ms. Lukie also *could not do*. Doc 31-7 - Pgs 404, 407.

### C.     <u>Plaintiff's Claims</u>

On March 5, 2018, Plaintiff dual-filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations ("FCHR").  Doc 1-1 - Pg 8.

On March 18, 2020, Plaintiff filed a Complaint in the Circuit Court of the Thirteenth Judicial Circuit (Hillsborough County) against MetLife, asserting claims of sex discrimination (premised on unequal pay and her being assigned "administrative" tasks), retaliation, and harassment under the Florida Civil Rights Act.  *See* Doc 1-1 - Pgs 5-15.  On April 23, 2020, MetLife removed the case to the Middle District of Florida on diversity jurisdiction grounds.  Doc 1 - Pgs 1-3. Following discovery, MetLife moved for summary judgment on all of Plaintiff's claims on the grounds that they were time-barred and/or that no reasonable juror could conclude that Plaintiff was discriminated against, harassed, or retaliated against by MetLife.

## II.     <u>THE DISTRICT COURT'S RULING</u>

On February 24, 2022, the District Court issued an order granting MetLife's motion for summary judgment.  Doc 40 - Pgs 1099-115 ("Order" at 1-17).  With respect to Plaintiff's discrimination claims, the District Court found that the purported "comparators" Plaintiff relied on were not true comparators, and that she had pointed to no other facts that would suggest she was subjected to unequal pay.

Order at 5-8 (Doc 40 - Pgs 1103-08).  With respect to Plaintiff's claim that she was assigned "administrative" tasks because of her gender, the Court concluded that disagreement with an employee's work assignments is not an "adverse action" under the FCRA, and, therefore, she could not sustain a discrimination claim premised on those grounds.  *Id.* at 8-10 (Doc 40 - Pgs 1106-08).

As to Plaintiff's harassment claims, the District Court correctly noted that the only purportedly "harassing" conduct pointed to by Plaintiff (the same conduct set forth in her brief here) occurred between 2007 and 2011, a minimum of 7 years before her 2018 administrative filing.  *Id.* at 10-12 (Doc 40 - Pg 1108-10).  The District Court therefore concluded that Plaintiff's harassment claim was time-barred (while also noting that even if considered on the merits the conduct did not rise to the level of hostility required to sustain such a claim).  *Id.* at 11-12 (Doc 40 - Pgs 1109-10).

Finally, as to her retaliation claim, the District Court assumed (without deciding) that Plaintiff had engaged in protected activity for purposes of an FCRA claim, and that the transfer of MIM Risk work was a "materially adverse" action.  *Id.* at 12-13 (Doc 40 - Pgs 1110-11).  Nevertheless, the District Court concluded that a reasonable factfinder could not infer causation based on any purported "temporal proximity" and, as Plaintiff had no other facts to support such an inference, her *prima facie* case failed.  *Id.* at 13-16 (Doc 40 - Pgs 1111-14).  Furthermore, the District

Court concluded that MetLife had proffered evidence of legitimate, non-retaliatory reasons for the transfer of the MIM Risk work, and that Plaintiff had pointed to no evidence of pretext other than her own "quarreling with the wisdom of Cox's decision," which the District Court held was insufficient to establish pretext. *Id.* at 15 (Doc 40 - Pgs 1113). With respect to Plaintiff's complaint that retaliatory actions resulted in a "constructive discharge," the Court noted that, given that Plaintiff's allegations did not rise to the level of even a harassment or hostile work environment claim, she could not sustain the even greater burden of showing that her working conditions were "unbearable." *Id.* at 16 (Doc 40 - Pgs 1114).

Following the District Court's opinion, the District Court dismissed all of Plaintiff's claims against MetLife. *See generally id.* (Doc 40 - Pgs 1099-1115). This appeal followed.

## SUMMARY OF THE ARGUMENT

This Court should affirm the District Court's order dismissing Plaintiff's claims.

First, the District Court correctly found that Plaintiff failed to demonstrate a genuine dispute of fact regarding her unequal pay claim, where she presented no proper comparators or any other evidence of intentional discriminatory actions with respect to her pay.

Second, the District Court correctly found that Plaintiff failed to demonstrate that being assigned "administrative tasks" was an adverse action; and, in any event, Plaintiff adduced no evidence that she was assigned such tasks because of her gender.

Third, the District Court correctly concluded that Ms. Lukie did not adduce evidence sufficient to raise even a minimal inference of retaliation for her *prima facie* case, let alone sufficient evidence to overcome MetLife's showing of legitimate non-retaliatory reasons for its actions with respect to MIM work; nor can she satisfy the high bar for constructive discharge.

Fourth, this Court could affirm the District Court's decision on several alternative and additional grounds, including that Plaintiff did not engage in any protected activity nor experience adverse actions.

For these reasons, the District Court's decision should be affirmed.

20

# ARGUMENT

## I.    STANDARD OF REVIEW

"Summary judgment decisions are reviewed *de novo*." *Chappell v. Chao*, 388 F.3d 1373, 1376 (11th Cir. 2004) (citing *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001)).  However, where the non-moving party has the burden of proof at trial, the moving party need only demonstrate that there is a lack of evidence to support the non-movant's claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has satisfied this burden, the burden of production shifts to the non-movant, who must "set forth specific facts showing that there is a genuine issue for trial" and "may not rest upon the mere allegations or denials of his pleading."  *A.L. by & through D.L. v. Walt Disney Parks & Resorts US, Inc.*, 900 F.3d 1270, 1289 (11th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 248 (1986)).  A "mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (citation omitted).

This Court may affirm on any ground appearing in the record, even if it is not one on which the district court relied.  *Chappell*, 388 F.3d at 1376-77 (citing *Secs. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 88 (1943) (stating that the decision

of the lower court must be affirmed if the result is correct, even though the lower court relied upon a wrong ground or gave a wrong reason)); *Lucas*, 257 F.3d at 1256.

## II. THE DISTRICT COURT CORRECTLY DETERMINED THAT NO REASONABLE TRIER OF FACT COULD FIND THAT PLAINTIFF WAS DISCRIMINATED AGAINST.[7]

### A. The District Court Correctly Determined That Plaintiff Failed To Establish She Was Paid Less Than Similarly Situated Male Employees.

At the summary judgment stage, Plaintiff presented no admissible evidence from which a factfinder could infer that she was "similarly situated" to the male comparators she identified, and thus, she could not satisfy her *prima facie* case with respect to her claim of unequal pay. Specifically, Ms. Lukie testified[8] that her alleged comparators, Jim Dingler, Scott Orr, Howie Kurpit, and Rob Semke, all had "different areas of expertise." Doc 31-7 - Pg 405. For example, "what [she] did and what Mr. Dingler did were *different*" because "he headed up the credit risk team"

---

[7] Plaintiff concedes that she is not appealing the dismissal of her harassment/hostile work environment claims, which the Court found were time barred. *See* Br. 27 n.4; Order at 10-12 (Doc 40 - Pg 1108-10).

[8] Plaintiff presented an affidavit at summary judgment that purported to claim that these individuals were similarly situated, the District Court correctly rejected that affidavit because it contained only "conclusory" assertions; it could also have done so because it was a sham affidavit that squarely rejected Plaintiff's own deposition testimony. *Van T. Junkins & Assocs. v. U.S. Indus., Inc.*, 736 F.2d 656, 657, 659 (11th Cir. 1984) (concluding affidavit was a "sham" where it contradicted deposition testimony and therefore did not create a genuine issue of material fact); *Faulk v. Volunteers of Am.*, 444 F. App'x 316, 318 (11th Cir. 2011) (affirming decision to strike portions of an affidavit that directly contradicted deposition testimony).

and *she did not even work in the credit risk group*. *Id.* Moreover, Mr. Dingler worked in the Investments group, *not* the Risk Management group. *Id.* Dingler also left MetLife in 2013, well outside the one-year period during which Plaintiff could bring a claim. F.S.A. § 760.11(1). Mr. Kurpit was a Senior Vice President, whereas Ms. Lukie was only a Vice President. Doc 31-7 - Pg 465. Additionally, Mr. Kurpit did "risk for EMEA," and Plaintiff "wouldn't be doing that, that wasn't [her] job." Doc 31-7 - Pg 465. Plaintiff admitted that she and Mr. Semke "had different jobs," and so *she did not know* what he was doing on a day-to-day basis. *Id*. In fact, Mr. Semke reported to a different manager, in a different group, and was the EMEA Risk Officer, a position Plaintiff never held. *Id.* Where a plaintiff is unaware of the job duties of a comparator, the employees are not comparable. *Gray v. City of Jacksonville*, 492 F. App'x 1, 4 (11th Cir. 2012). Finally, Plaintiff admitted that, because Mr. Orr was an actuary, he was on a different pay scale than her. She explained, "A: . . . [actuaries] were on a different pay scale than the corporate pay scale. So the actuaries were compensated differently than non-actuaries. Q: Actuaries were paid more, correct? A: **Yes**." Doc 31-7 - Pgs 375-76 (emphasis added). In addition to being an actuary, Mr. Orr is also a "quant" – and so he is able to oversee the risk analyses for Market Risk-Derivatives, something Ms. Lukie *could not do*. Doc 31-7 - Pgs 404, 407.

23

Unable to refute her own sworn testimony, Plaintiff now seeks to convince this Court that merely having the same corporate title and reporting to the same SVP is sufficient to establish that Plaintiff's purported comparators were "similarly situated" in all "*material*" respects. *Lewis v. City of Union City*, 918 F.3d 1213, 1226 (11th Cir. 2019) (en banc) (emphasis added). That is wrong.[9] *Id.* at 1228 (explaining that "a valid comparison will turn not on formal labels, but rather on substantive likenesses"); *Calicchio v. Oasis Outsourcing Grp. Holdings, L.P.*, No. 21-12854, 2022 WL 2761720, at *4 (11th Cir. July 15, 2022) (affirming grant of summary judgment for defendant on Equal Pay Act and Title VII claims where plaintiff failed to produce evidence that the purported comparator's *primary job duties* were similar); *Heatherly v. Univ. of Ala. Bd. of Tr.*, 778 F. App'x 690, 693 (11th Cir. 2019) (coworker not a comparator in an Equal Pay Act and Title VII case where *job titles were similar but duties were different*); *Earle v. Birmingham Bd. of Educ.*, 843 F. App'x 164, 165 (11th Cir. 2021) (rejecting purported comparator in

---

[9] Plaintiff bemoans the fact that if the Court does not adopt her (incorrect) interpretation of the law "no similarly situated comparator would exist, and MetLife could discriminate against Lukie . . . regarding pay with no consequences." Br. at 37-38. That argument is without merit for two reasons: (1) the FCRA does not guarantee Plaintiff a comparator to use or permit her to rely on "the closest comparator[] that exist[s]" (Br. at 36); and (2) it is *not discriminatory* for MetLife to pay workers who perform different jobs different wages. Nothing in *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1531 (11th Cir. 1992), holds to the contrary.

24

Title VII disparate pay case although he held the same job title as plaintiffs); *Eliassaint v. RTG Furniture Corp.*, 551 F. Supp. 3d 1293, 1306 n.2 (M.D. Fla. 2021) ("sharing a job title, standing alone, is not dispositive" as to whether individuals are comparators); *Joyner v. Town of Elberta*, 22 F. Supp. 3d 1201, 1206 (S.D. Ala. 2014) (whether work is "equal . . . does not depend simply on a comparison of job titles or classifications, but on a comparative analysis of actual job requirements and performance.") (citation omitted).

Finally, Plaintiff seems to ignore that, even if she could establish that any one of the alleged comparators were "similarly situated," that would satisfy only her *prima facie* case; she would then have to prove that the disparity in pay was a result of *intentional* discrimination, in light of MetLife's undisputed, nondiscriminatory reasons for paying Plaintiff and her purported comparators differently (namely, their respective different skill sets, duties, accreditations/certifications, and the applicability of different pay scales based on those factors). *Calicchio*, 2022 WL 2761720, at *4; *Miranda*, 975 F.2d at 1531.[10]  At best, she quarrels with the "wisdom" or "fairness" of those factors and proposes her own that she, apparently, believes MetLife should have used instead.  That is not enough to establish pretext. *See* Section III(B)(2), *infra.*  Although the District Court did not need to reach that

---

[10] Plaintiff has not brought claims under the Equal Pay Act, nor is there an analogous statute under Florida law.

issue (Order at 5-8 (Doc 40 - Pgs 1103-08)), this Court may also affirm on this ground. *Chappell*, 388 F.3d at 1376-77.

For these reasons, Plaintiff's disparate pay claim should be dismissed.

### B. Plaintiff Failed To Adduce Evidence That She Was Assigned Tasks In A Discriminatory Manner.

The District Court concluded that Plaintiff presented no evidence that her assignments to tasks she now claims she did not want were "adverse actions."[11] Plaintiff takes issue with this conclusion, arguing (albeit in a conclusory fashion) that those assignments impacted the terms and conditions of her employment. Not only is Plaintiff incorrect that the distribution of work in the ordinary course of business was an "adverse action," Plaintiff cannot even establish that she in fact received such work more often than her colleagues, let alone that she did so *because* of her gender. *Sutherland v. Boehringer-Ingelheim Pharms., Inc.*, 700 F. App'x 955, 959 (11th Cir. 2017). Plaintiff's claim therefore fails.

As a preliminary matter, Plaintiff appears to suggest that *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1561 (11th Cir. 1986) stands for the proposition that Plaintiff need not show an employment action was "materially adverse." Br. at

---

[11] Although the District Court did not explicitly decide this issue, it bears noting that any claim asserted by Plaintiff that relates to assignments she received prior to March 5, 2017 is time-barred. F.S.A. § 760.11(1). That leaves only a two-month period between March 5, 2017 and Plaintiff's resignation on May 9, 2017 where the assignment of administrative tasks could be considered.

42.  Of course, that is contrary to the longstanding law as confirmed by the Supreme Court and this Circuit, and as Plaintiff then acknowledges in her own brief.  Br. at 44; *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (clarifying the standard for adverse employment actions under Title VII); *Jackson v. Hall Cnty. Gov't*, 518 F. App'x 771, 773 (11th Cir. 2013).

Under this standard, Plaintiff fails to show her assignment to administrative work was actionable, because it was not *materially* adverse.  Plaintiff has adduced no evidence that could show a material change occurred with respect to her employment.  Plaintiff's pay remained commensurate with her position; she regularly received raises; her reviews were excellent; her title remained unchanged; and at no point did any assignment change alter her benefits, opportunities, or any other term or condition of her employment.  Therefore, Plaintiff cannot establish that the allegedly "administrative" duties she was assigned constituted an "adverse action."  *Id.* (upholding summary judgment because shift assignments were not "materially adverse employment actions," and the employee pointed to no evidence of a material change in her employment); *McCone v. Pitney Bowes, Inc.*, 582 F. App'x 798, 800 (11th Cir. 2014) (affirming dismissal of claim and noting that "because work assignment claims strike at the very heart of an employer's business judgment and expertise, absent unusual circumstances, they typically do not constitute adverse employment actions."); *see also Carney v. City of Dothan*, 158 F.

27

Supp. 3d 1263, 1280 (M.D. Ala. 2016) ("mere changes in work-related duties, where unaccompanied by changes in compensation or other tangible conditions of employment, generally are not material under the meaning of the statute"). The District Court correctly recognized this when it concluded that Plaintiff's complaints amounted to "ordinary workplace tribulations" rather than adverse employment actions. Order at 10 (Doc 40 - Pg 1108).[12]

In addition, Plaintiff's self-serving description of her "administrative work" as merely formatting "colors and fonts" is contrary to the record evidence. Under oath Plaintiff readily admitted that her "administrative work" included: (1) attending meetings with the Company's most senior officers and drafting responses to external regulatory agencies based on those meetings (Doc 31-7 - Pg 382); (2) being included in a working group to which she contributed Risk Management expertise (Doc 31-7 - Pgs 386-87); (3) drafting reports that would otherwise have been drafted by her direct supervisor, Mr. Cox (*id.*); and (4) essentially any project that Plaintiff deemed "not her responsibility," regardless of whether the project required a high level of skill or expertise (Doc 31-7 - Pgs 377, 382, 383, 390, 449). Thus, to the extent

---

[12] Plaintiff's reliance on *Smith v. Fletcher*, 559 F.2d 1014, 1017-18 (5th Cir. 1977) is inapposite, as that case was decided long before *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006), in which the Supreme Court clarified that adverse employment actions must be "materially adverse." The same is true for *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1561 (11th Cir. 1986).

Plaintiff intends to paint a picture that she was merely a "scribe" handling basic formatting of documents, rather than working on tasks that required content creation based on her own skills and expertise, her testimony belies that picture.[13]  Doc 31-4 - Pgs 317-18, 322, 325.

Plaintiff also repeatedly admitted that she has no evidence that she was given any particular assignment or type of assignment *because* of her gender, and, instead, is relying on her own subjective belief.  Doc 31-7 - Pgs 379, 380, 397, 413, 461.  She could point to no comments linking any work or assignment to her gender, nor did she assert that the individuals assigning her the work (Mr. Cassandra and Mr. Cox) displayed any other type of discriminatory animus toward her.  Doc 31-7 - Pgs 395, 414, 416, 467.  Moreover, using certain uniform fonts on reports for senior executives and Board members **was a company requirement, not one created for Ms. Lukie alone**.  Doc 31-7 - Pgs 391-92.  Therefore, Plaintiff cannot establish even a *prima facie* case of discrimination.  *See, e.g.*, *Cooper v. S. Co.*, 390 F.3d 695, 745 (11th Cir. 2004) (affirming summary judgment where the plaintiff relied on conclusory allegations based entirely on her own subjective beliefs); *Siff v. Audiology Distrib., LLC*, No. 19-61606, 2020 WL 6268208, at *3 (S.D. Fla. Oct. 19,

---

[13] And, of course, MetLife employed plenty of administrative assistants whose duties included, as the name suggests, purely administrative tasks, and who were available to Ms. Lukie at all times.  Doc 31-4 - Pg 325.

2020) ("[C]onclusory allegations based on subjective beliefs are [] insufficient to create a genuine issue of material fact and, therefore, do not suffice to oppose a motion for summary judgment"), *aff'd*, No. 20-13964, 2022 WL 73758 (11th Cir. Jan. 7, 2022).

Plaintiff appears to take the position that because she was purportedly the "only female VP" and "the only one" who received "administrative" tasks, that is sufficient to show discriminatory intent. Alternatively, she seems to believe that her own subjective assessment of her qualifications and/or time-barred harassing comments from individuals who were not her supervisors, did not assign her work, and had nothing to do with her job would show the requisite intent.[14] Plaintiff is wrong on all counts. *Baker v. Cont'l Aerospace Techs., Inc.*, No. 21-cv-00004, 2021 WL 6050437, at *3 (S.D. Ala. June 9, 2021) (dismissing plaintiff's claim of sex discrimination for failure to allege facts sufficient to infer discrimination despite status as the only female member of her team); *Cooper*, 390 F.3d at 745; *Jones v. Unity Behavioral Health, LLC*, No. 20-14265, 2021 WL 5495578, at *3 (11th Cir. Nov. 23, 2021) ("[C]omments by non-decisionmakers do not raise an inference of discrimination") (citation omitted).

---

[14] To the extent Plaintiff argues that Mr. Cassandra asking her on one occasion to "be the scribe" is a gendered comment, there is no evidence that Mr. Cassandra was referring to or considering her gender in any way.

30

For all these reasons, the Court should affirm the District Court's grant of summary judgment on this claim.

## III. THE DISTRICT COURT CORRECTLY DETERMINED THAT NO REASONABLE TRIER OF FACT COULD FIND THAT PLAINTIFF WAS RETALIATED AGAINST.

### A. Plaintiff Failed To Establish Even A *Prima Facie* Case Of Retaliation.

To establish a *prima facie* case of retaliation, Plaintiff must establish: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse employment action; and (3) a causal relationship between the two events. *Peters v. HealthSouth of Dothan, Inc.*, 542 F. App'x 782, 786 (11th Cir. 2013) (per curiam). Although the District Court assumed without deciding that Plaintiff satisfied the first two requirements, she, in fact, satisfied none. This Court may therefore affirm dismissal of her retaliation claim at the *prima facie* stage on any of three grounds. *Chappell*, 388 F.3d at 1376-77.

First, Plaintiff did not engage in any protected activity because *none* of her alleged "complaints" to her managers during her employment with MetLife actually complained about discrimination. Although Plaintiff now tries to characterize her complaints as "complaints about the sexist division of labor" (Br. at 3), at deposition, Plaintiff repeatedly *denied* ever suggesting that her complaints were tied to her sex

or gender.[15]  Doc 31-7 - Pgs 379, 380, 441; *Freese v. Wuesthoff Health Sys., Inc.*, No. 06-CV-175, 2006 WL 1382111, at \*7 (M.D. Fla. May 19, 2006) ("To engage in protected activity, an employee must . . . at the very least, communicate her belief that discrimination is occurring to the employer.") (emphasis added).  Plaintiff explained that she only complained her "administrative tasks" were "very time consuming and it was impeding [her] ability to focus . . . as a risk management professional."  Doc 31-7 - Pg 377.[16]  Plaintiff cannot now use her appellate brief, or

---

[15] One need only review the material which Plaintiff herself cites to confirm this.  In support of her assertion that she complained about a "sexist division of labor," she points to (1) her own summary judgment opposition brief (which is not evidence), and (2) cites from her deposition, in which she does not mention even *once* that she complained she was being assigned administrative work *because of her gender*.  Plaintiff points the Court to no testimony regarding any purported complaint in which she did raise her gender or that she believed she was being discriminated against – because she cannot.  No such complaint was ever made.

[16] At deposition, Ms. Lukie claimed that an alleged complaint about providing information to third-party clients is what triggered Mr. Cox to retaliate against her, not any purported complaints about administrative work.  Doc 31-7 - Pg 427.  However, her alleged complaint about third-party clients, raised **over a year** prior to resigning, is completely unconnected to any notion of gender, sex, or discrimination and, therefore, is not statutorily protected.  *Freese*, 2006 WL 1382111, at \*7.  She also claimed that the alleged "adverse action" that constituted retaliation was the assignment of administrative work, despite the fact that she conceded she was purportedly assigned such work before and after that complaint. *Manley v. DeKalb County*, 587 F. App'x 507, 512 (11th Cir. 2014) ("[I]f the alleged retaliatory conduct occurred before the employee engaged in protected activity, the two events cannot be causally connected").  It is therefore not surprising that Plaintiff has not pursued a claim of retaliation based on those facts, and any attempt to raise that claim on reply should be rejected as waived.  *See generally* Br. at 52-64.

a sham affidavit with conclusory assertions, to undo the damage to her *prima facie* case that was done by her own sworn testimony at deposition. *Stover v. Ocala Auto. Mgmt., LLC*, No: 5:15-cv-538, 2016 WL 8711719, at *2 n.1 (M.D. Fla. Sept. 9, 2016) ("Plaintiff is not permitted to create an issue of genuine material fact by providing an affidavit that contradicts, rather than clarifies, her prior testimony") (citing *Van T. Junkins & Assocs.*, 736 F.2d at 657).

Second, the "adverse action" Plaintiff complains of – the transfer of her MIM Risk duties to Mr. Orr – is not an adverse employment action that could sustain a claim of retaliation. To be actionable, an adverse employment action must be "a serious and material change in the terms, conditions, or privileges of employment." *Minnifield v. City of Birmingham Dep't of Police*, 791 F. App'x 86, 90 (11th Cir. 2019) (emphasis omitted). Neither the reassignment of responsibility for MIM Risk (which constituted a mere 10-20% of Ms. Lukie's responsibilities), nor the assignment of supervision over one employee, Mr. Maxwell, was a "material" change in Ms. Lukie's responsibilities. There was no change in her salary, title, or any of the other benefits of her employment. In fact, just a month earlier she had received an exceptional performance review, another raise, and a six-figure bonus. Doc 31-34 - Pg 599. There was also no meaningful change in her workload. Doc 31-7 - Pg 449. Put simply, having 10-20% of one's duties changed for other duties is *not* an adverse employment action. *Minnifield*, 791 F. App'x at 90; *Greene v.*

33

*Loewenstein, Inc.*, 99 F. Supp. 2d 1373, 1382 (S.D. Fla. 2000) ("purely lateral transfer . . . if not accompanied by any change in position, title, or salary . . . is not an adverse employment action.") (citation omitted).  That Ms. Lukie would have *preferred* to keep the MIM Risk work and/or to not supervise Mr. Maxwell is not sufficient to transform MetLife's legitimate, non-discriminatory re-allocation of one of her assignments into an adverse action.  *MacLean v. City of St. Petersburg*, 194 F. Supp. 2d 1290, 1298 (M.D. Fla. 2002) ("[T]he employee's subjective view of the significance of the employer's action is not controlling; rather, the employment action must be materially adverse to a reasonable person under the circumstances.").

Either of these grounds is sufficient for the Court to affirm summary judgment on Plaintiff's retaliation claim.  In addition, as discussed further below, Plaintiff has failed to meet the third requirement that she produce even minimal evidence of a causal link between any protected activity and the transfer of her MIM Risk duties, let alone sufficient evidence to overcome MetLife's proffered legitimate, non-retaliatory reasons for doing so.

### B.    Plaintiff Has No Evidence Of Any Causal Link Between Any Purported "Protected Activity" And The Complained-Of Actions.

Plaintiff's retaliation claim also fails because, as the District Court noted, she has failed to produce even a scintilla of evidence that MetLife undertook the actions she now complains of *because* she engaged in protected activity.  As the District Court recognized, her failure to produce any evidence at all of a causal link means

34

that she cannot overcome even her *prima facie* burden. Order at 12-14 (Doc 40 - Pg 1110-12). And even if she could, she has not come forward with any evidence from which a factfinder could conclude that MetLife's legitimate, non-retaliatory reasons were pretextual, let alone a pretext for retaliation. Indeed, Plaintiff herself admitted at deposition that *she possessed no evidence* that the reason for the reassignment of duties was retaliatory. For these additional reasons, her claim fails.

      1.    Plaintiff Cannot Prove Temporal Proximity By A Preponderance Of The Evidence.

Plaintiff concedes in her brief that she would be required to establish that she engaged in protected activity no more than a month prior to the alleged adverse action to establish sufficient temporal proximity to sustain a *prima facie* case. Br. at 56; *see also Avila v. Childers*, 212 F. Supp. 3d 1182, 1189 (N.D. Fla. 2016) (dismissing claim where alleged adverse action occurred eight months after protected activity, noting "[w]hen there is no other evidence to demonstrate causation . . . 'the complaint of retaliation fails as a matter of law.'") (citation omitted); *see also Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1182 (11th Cir. 2010) ("Even a three-month interval between the protected expression and the employment action . . . is too long."). Nevertheless, she contends that the District Court incorrectly concluded there was no temporal proximity because Plaintiff contended she was making "ongoing complaints" to Mr. Cox regarding her administrative tasks, and that the jury could therefore "infer that at least one

complaint occurred within one month of [Mr.] Cox's *decision* to remove her MIM duties (as early as February 2017)."  Br. at 56-57.

Plaintiff grasps at Mr. Cox's testimony that he was considering moving the MIM Risk work "as early as February 2017" in an attempt to move the needle closer to the beginning of the year, to try to persuade the Court that her claim that she made complaints in 2017 could establish temporal proximity.  Plaintiff is factually and legally mistaken.  First, February 2017 is not the relevant date, because temporal proximity is measured by the date of the *adverse action* – and a manager merely contemplating reassignment of duties is not an "adverse action."  *Minnifield*, 791 F. App'x at 90.  Second, Plaintiff again seeks to distort the record by claiming that her alleged complaints in "2016 and 2017" could establish temporal proximity.  As the District Court correctly noted, "the only evidence of a complaint in 2017 comes from Cox, who testified in deposition that Plaintiff complained to him about the "administrative" tasks *after* he transferred the MIM work to Orr."  Order at 13 (emphasis in original) (Doc 40 - Pg 1111).  Not only is that not protected activity, but there can also be no inference of causation where the complaint occurred *after* the alleged adverse action.  *Id.* (collecting cases).

In any event, Plaintiff's argument for temporal proximity either ignores or misapprehends her burden of proof at trial.  For a reasonable factfinder to find in her favor, Plaintiff would have to affirmatively *prove*, by a preponderance of the

evidence, that she did *in fact* engage in a protected activity that was *in fact* close in time to the alleged adverse action, in order to prove her own *prima facie* burden. Plaintiff points to no complaint that she *in fact* made within one month of February 2017, let alone made within one month of the transfer of the MIM Risk work. Were this evidence presented to a jury, the best that they could conclude would be that it was *theoretically possible* that Plaintiff made a complaint (with no indication that such complaint was protected activity) within one month of February 2017 (an irrelevant date for purposes of showing an "adverse action"), and also *theoretically possible* that she did not. That cannot, by definition, satisfy Plaintiff's burden of "preponderance of the evidence." Plaintiff has therefore failed to establish temporal proximity.

> 2. Plaintiff Has No Supportable Argument That MetLife's Reasons Were Pretextual.

In any event, even if Plaintiff were able to establish temporal proximity, she would not be able to meet her burden of producing evidence that retaliation was the "but-for" reason for the transfer of MIM Risk responsibilities rather than the legitimate non-retaliatory reasons proffered by MetLife. *Palm Beach Cnty. Sch. Bd. v. Wright*, 217 So. 3d 163, 165 (Fla. Dist. Ct. App. 2017) (confirming that "but-for" causation standard applies to retaliation claim). For the reasons discussed above, MetLife had legitimate, nonretaliatory business reasons for reorganizing the MIM Risk responsibilities and giving Ms. Lukie supervision over Mr. Maxwell. Ms.

Lukie *chose* to move to Florida and away from her direct reports and business leaders. Doc 31-13 - Pg 553. Mr. Orr was to be based in New Jersey. Doc 31-43 - Pg 669. Mr. Cox wanted a new, broader, quantitative approach to assessing MIM Risk, and Mr. Orr, not Ms. Lukie, had the needed background and skills. Doc 31-4 at 19-20; Doc 31-43 at 20-21. Ms. Lukie has adduced no evidence whatsoever that those reasons were pretext for retaliation, let alone that retaliation was the "but-for" reason for MetLife's actions.

Plaintiff throws out various unspecific theories as to how a jury might conclude MetLife's explanation was a pretext for retaliation. All of her arguments fail.

First, Plaintiff points to her own past performance, which it is undisputed was rated positively by MetLife. But as MetLife explained, Plaintiff's performance was *not* the reason for the transfer of the MIM Risk work – it was because Mr. Orr, who was rejoining the company, had a different background and skills and would be based in New Jersey, where the individual doing the day-to-day work of MIM Risk would also be located. Doc 31-4 at 19-20. Plaintiff's argument boils down to an assertion that because her performance was good, she should have kept the responsibilities she preferred – but it does nothing to prove that MetLife's reasons were pretextual, let alone retaliatory. *Vira v. Crowley Liner Servs., Inc.*, 723 F. App'x 888, 895 (11th Cir. 2018) (no pretext where plaintiff was "laid off despite

38

receiving numerous positive performance reviews" where cost motivated layoffs); *Chapman v. AI Transp.*, 229 F.3d 1012, 1029 (11th Cir. 2000) (plaintiff's "assertions about his good performance" did not demonstrate pretext when plaintiff's performance was not related to employer's nondiscriminatory reasons for selecting other candidate).

Second, Plaintiff asserts that Mr. Cox had agreed to transfer her to Tampa before she complained to him about administrative work. It's unclear why Plaintiff believes this shows pretext or how it possibly could support that conclusion. There is no evidence that Mr. Cox guaranteed that Plaintiff could continue with MIM Risk (or any other specific assignments) when he agreed she could relocate to Tampa (which MetLife did because it believed it was helping Plaintiff remain safe from her abusive boyfriend). Doc 31-13 - Pg 553; Doc 31-7 - Pgs 421-22, 424. It is also undisputed that Plaintiff began working from the Tampa office *months* before Mr. Cox began the process of bringing Mr. Orr back to the firm, which only demonstrates that MetLife was happy to have Plaintiff handle the MIM Risk work *until someone they thought would be better suited to the role* came on board.

Third, Plaintiff points to the testimony of Ray Liu that Mr. Orr's leadership was "lacking" because he was "juggling two priorities." Putting aside that Mr. Liu's testimony is personal and subjective, it says nothing of *MetLife's* perception of Mr. Orr's qualifications or results or intent in making any decision. Moreover, the

*results* of a business decision prove nothing regarding the *motive* behind a decision. *See, e.g.*, *Ostrow v. GlobeCast Am. Inc.*, 489 F. App'x 433, 437 (11th Cir. 2012) (no pretext where plaintiff was terminated during restructuring intended to save costs; although plaintiff claimed the restructuring in fact cost defendant more, "The inquiry is whether [the decisionmaker] believed in good faith (even mistakenly) that his restructuring plan would save money, not whether it in fact did so."). The same holds true for Plaintiff's assertions that Mr. Cox was, "in reality, just giving Orr his old quantitative job back . . . and, in addition, giving him Lukie's MIM duties," Br. at 61, and that the MIM duties were "given to someone else in 2018." That the assignment of work did not remain the same in perpetuity does not prove that work was assigned on a retaliatory basis.

Finally, Plaintiff suggests that Mr. Cox proffered inconsistent explanations for his reassignment of the MIM Risk work to Mr. Orr, because in an email to Ms. Lukie after her resignation he did not specifically reference Mr. Orr's quantitative background. Doc 31-47 - Pg 704. While shifting or inconsistent explanations can, in some cases, raise an issue of pretext, a plaintiff cannot demonstrate pretext simply by showing that the explanation was not identical at all times – the allegedly "shifting" reasons must be inconsistent with one another. *McCall v. Bright House Networks, LLC*, No. 18-cv-1670, 2020 WL 70974, at *10 (M.D. Fla. Jan. 7, 2020) ("To be considered evidence of pretext, the reasons should generally be

40

inconsistent . . . [t]he mere fact that an employer offers an additional reason for the employment decision does not suggest pretext if both reasons are consistent."), *appeal dismissed*, No. 20-10268-A, 2020 WL 1987744 (11th Cir. Feb. 26, 2020); *Pate v. Chilton Cnty. Bd. of Educ.*, 853 F. Supp. 2d 1117, 1133-34 (M.D. Ala. 2012) (for reasons to be shifting, the "new reasons relied on in litigation must plainly contradict the reasons relied on at the time of the decision to be found to be pretextual. The reasons must contradict each other, and not merely be cumulative."). There is nothing inconsistent about selecting an employee to take on tasks because that employee would be in the same location as other members of the team, and also selecting that employee because, in the manager's view, that employee has a better background skill set. Thus, Mr. Cox's failure to explicitly reference Mr. Orr's quantitative background in his email to Ms. Lukie does not evidence any pretext.

Taking all of these purported "hints" of pretext together, they are nothing more than Plaintiff's self-serving disagreement with MetLife's business decision to assign a small subset of tasks to one employee rather than the other. And, as the District Court correctly noted at the summary judgment stage, mere disagreement with the wisdom or utility of MetLife's business decisions simply cannot support a finding that MetLife did not genuinely believe in the reasons for those decisions – in other words, it cannot support a finding that MetLife was using those reasons as a pretext for retaliation. Order at 14-15 (collecting cases); *Gogel*, 967 F.3d at 1143

(noting "the long-standing principle" that courts should not "sit as a super-personnel department that reexamines an entity's business decisions.") (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)); *Ostrow*, 489 F. App'x at 437 (plaintiff's arguments that "merely quarrel[] with the wisdom of [the] restructuring decision" did not establish pretext). In issuing its Order, the District Court did not weigh the parties' evidence or make credibility determinations – it simply analyzed Plaintiff's arguments in light of the undisputed evidence (or lack thereof) in the record and concluded, correctly, that Plaintiff's arguments did not establish pretext in light of this "long standing principle" of law. *Gogel*, 967 F.3d at 1143. That Plaintiff does not like that result does not make the District Court's reasoning improper.

For all of these reasons, the Court should affirm the District Court's grant of summary judgment on Plaintiff's retaliation claim.

## IV. THE DISTRICT COURT CORRECTLY DETERMINED THAT NO REASONABLE TRIER OF FACT COULD FIND THAT PLAINTIFF WAS CONSTRUCTIVELY DISCHARGED.

Although Plaintiff addresses constructive discharge under the umbrella of her retaliation claim, she appears to tie her claim instead to "discrimination, culminating in the removal of Lukie's MIM duties" (which appears to be a tacit concession that any purported protected activity is *not* what caused the removal of those duties). Br.

42

at 64.  In any event, her claim of constructive discharge was appropriately rejected by the District Court.

"Constructive discharge occurs [only] when an employer deliberately makes an employee's working conditions *so unbearable* that a *reasonable* person in that position would be compelled to resign."  *Walsh v. City of Ocala*, No. 18-0402, 2019 WL 4395297, at *7 (M.D. Fla. June 17, 2019) (emphasis added) (citing *Zarza v. Tallahassee Hous. Auth.*, 686 F. App'x 747, 753 (11th Cir. 2017)), *report and recommendation adopted*, No. 18-CV-402, 2019 WL 3297248 (M.D. Fla. July 23, 2019).  Meeting this standard requires Plaintiff to show that she was subjected to "severe" and "pervasive" conduct.  She could not and cannot do so.  No reasonable person in Plaintiff's position would have felt compelled to resign because a small portion of their work (1) was "administrative"; and/or (2) was transferred to another manager in exchange for other responsibilities.[17]

In any event, Plaintiff has not presented, because it does not exist, any evidence to dispute that: (1) Mr. Orr wanted more responsibility; (2) Mr. Cox wanted to provide that incentive to Mr. Orr; (3) Mr. Cox wanted to give Mr. Liu a

---

[17] Indeed, "this claim requires showing an *even greater* severity or pervasiveness of harassment than is required for a hostile work environment claim."  *Id.* (emphasis added).  As Ms. Lukie could not even establish a claim for harassment on the facts in the record (although, as noted above, she failed to appeal the dismissal of those untimely claims in any event), she certainly could not meet the even higher bar of showing constructive discharge.

supervisor on site in New Jersey; (4) the bulk of the MIM Risk business leaders were in New Jersey (and not in Florida); or (5) Mr. Maxwell, like Plaintiff, was in the Tampa office and needed supervision.  Doc 31-43 - Pg 677; Doc 31-4 - Pgs 308-10. None of those reasons are related to Plaintiff's gender or any alleged protected activity.  They occurred because Mr. Orr was rehired, and because Plaintiff requested a transfer to Florida.  Doc 31 - Pgs 221-22.

Moreover, contrary to any inference of discrimination, it is undisputed that *Plaintiff was totally supported by numerous supervisors and colleagues, including Mr. Cox, who actively worked to prevent her from resigning on numerous occasions*.  Doc 31 - Pgs 216 & n.2, 219, 222.  Those individuals, and MetLife, did all they could to keep Ms. Lukie safe, happy, and healthy in her job, despite her myriad personal issues.  Doc 31 - Pgs 217, 218-21.  Just months before she resigned, MetLife gave her another excellent performance review, an $8,000 raise, and a $115,000 bonus.  Doc 31-35 - Pg 603; Doc 31-34 - Pg 599.  They allowed her to transfer to the geographic location of her choice – even though nearly all of her direct reports were hundreds of miles away.  Doc 31-7 - Pg 424.

Plaintiff's principal argument for why she "had to" resign appears to be that her work on MIM Risk and supervision of Mr. Liu were assigned to Mr. Orr in New Jersey.  However, as confirmed by Ms. Lukie's own stated goals for 2017, ***nearly all of her work from 2016 stayed with her in 2017***, and *99% of her goals were*

*unaffected by the change in MIM Risk responsibilities*.  Doc 31-53 - Pgs 716-19.
Indeed, only one sub-goal out of three and one-half pages of her 2017 goals pertained
to MIM Risk.  *Id.*  Moreover, Mr. Cox confirmed that the day-to-day work of MIM
Risk management was performed by Mr. Liu and not by Ms. Lukie, both while Mr.
Liu was working for Ms. Lukie and then for Mr. Orr.  Doc 31-4 - Pg 324.  On these
undisputed facts, no reasonable fact finder could conclude that the decisions to
reassign MIM work and to have Mr. Liu report to Mr. Orr caused Ms. Lukie's role
to become so "unbearable" that she had no choice but to resign.  *See Van Der Meulen
v. Brinker Int'l*, 153 F. App'x 649, 655-56 (11th Cir. 2005) (finding no constructive
discharge despite plaintiff's argument that "her key employee duties were reduced,"
where complained-of incident "did not cause any objective change in her
employment" and "both [her manager] and [manager's boss] attempted to get her to
come back to work after she quit."); *Lawrence v. Wal-Mart Stores, Inc.*, 236 F. Supp.
2d 1314, 1327 (M.D. Fla. 2002) (rejecting constructive discharge claim where, *inter
alia,* "[a]lthough Plaintiff's duties changed . . . the changes were not *significant*").
Accordingly, MetLife was appropriately granted summary judgment on Plaintiff's
constructive discharge claim.

## <u>CONCLUSION</u>

For the reasons set forth above, this Court should affirm the District Court's order granting summary judgment on Plaintiff's claims.

Dated: November 23, 2022                    Respectfully submitted,

*/s/ Christopher A. Parlo*
MORGAN, LEWIS & BOCKIUS LLP
Christopher A. Parlo
101 Park Avenue
New York, NY 10178
(212) 309-6000
chris.parlo@morganlewis.com

Joseph D. Magrisso
600 Brickell Avenue, Suite 1600
Miami, FL 33131
(305) 415-3000
joseph.magrisso@morganlewis.com

*Counsel for Defendant-Appellee*
*MetLife Group, Inc.*

46

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,464 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32-4.

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface, Times New Roman 14-point font.

Dated: November 23, 2022              */s/ Christopher A. Parlo*
                                              Christopher A. Parlo

                                              *Counsel for Defendant-Appellee*
                                              *MetLife Group, Inc.*